UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

NANCY FIEDLER, Personal Representative of the Estate of LISA FIEDLER (Deceased); MATTHEW GUINEY, Personal Representative of the Estate of MARYBETH GUINEY (Deceased); OLGA FAYNSHTEYN, Personal Representative of the Estate of YULIYA KRASHENNAYA (Deceased); KATIE OSBORNE, Personal Representative of the Estate of DANIEL GARCIA (Deceased); CHRISTINA QUITASOL, Personal Representative of the Estate of MICHAEL QUITASOL (Deceased); SARMA WILLIAMS, Personal Representative of the Estate of VAIDEHI DEVI CAMPBELL WILLIAMS (Deceased); CHRISTINE ALEXANDRA DIGNAM, Personal Representative of the Estate of JUSTIN DIGNAM (Deceased); JASMINE LORD, Personal Representative of the Estate of CHARLES McILVAIN (Deceased); VICTORIA E. MOORE, Personal Representative of the Estates of RAYMOND SCOTT CHAN (Deceased) and KENDRA CHAN (Deceased); YUKA OHASHI MERRITT, Personal Representative of the Estate of YUKO HATANO (Deceased); VIKRAM SINGH, Personal Representative of the Estate of SUNIL SINGH SANDHU (Deceased); NINA HUTTEGGER, Personal Representative of the Estate of JUHA-PEKKA AHOPELTO (Deceased); YADIRA ALVAREZ, Personal Representative of the Estate of BERENICE FELIPE (Deceased); SEJAY TAN, Personal Representative of the Estate of WEI TAN (Deceased);

Case No.

**COMPLAINT FOR WRONGFUL DEATH AND SURVIVAL DAMAGES UNDER THE SUITS IN ADMIRALTY ACT**

1

ERIC BALTZ, Personal Representative
of the Estate of NEAL BALTZ
(Deceased); ANTHONY
BEITZINGER, Personal Representative
of the Estate of PATRICIA
BEITZINGER (Deceased); SHRUTI
DEOPUJARI, Personal Representative
of the Estate of SANJEERI
DEOPUJARI (Deceased); ATLEE
FRITZ, Personal
Representative of the Estate of
ANDREW FRITZ (Deceased); SEEMA
SHARMA, Personal
Representative of the Estate of
KAUSTUBH NIRMAL (Deceased);
MARGARET STROM, Personal
representative of the Estate of TED
STROM (Deceased); RICHARD X.
LIU, Personal Representative  of the
Estate of XIANG LIN; SUSANA
SOLANO ROSAS, Personal
Representative of the Estates of
EVANMICHEL SOLANO QUITASOL
(Deceased), ANGELA ROSE SOLANO
QUITASOL (Deceased), and NICOLE
SOLANO QUITASOL (Deceased);
ARIEL TAKVAM, Personal
Representative of the Estate of
KRISTIAN TAKVAM (Deceased);
DOMINIC MICAEL SELGA, Personal
Representative of the Estate of
FERNISA JUNE SISON (Deceased);
ROBERT KURTZ and CHERIE
MCDONOUGH, Personal
Representatives of the Estate of
ALEXANDRA HALEY KURTZ;
JEAN ANNE ALLEN as Executor of
the Estate of STEVEN JOHN SALIKA,
Executor of the Estate OF CAROL
DIANA ADAMIC and Administrator of
the Estate of TIA NICOLE ADAMIC
SALIKA; JAMES ADAMIC,
individually and as beneficiary of the
Estate of CAROL DIANA ADAMIC

SIAA Complaint of Plaintiffs
for Wrongful Death and Survival Damages

1  (Deceased); ANGELIKA ADAMIC,
2  individually and as beneficiary of the
   Estate of CAROL DIANA ADAMIC
3  (Deceased); MARK ADAMIC,
   individually and as beneficiary of the
4  Estate of CAROL DIANA ADAMIC
5  (Deceased); SHIRLEY SALIKA,
   individually, and as beneficiary of the
6  Estate of STEVEN JOHN SALIKA
   (Deceased) and TIA NICOLE SALIKA
7  (Deceased); DANIEL POH-HOCK
8  CHUA, Personal Representative of the
   Estate of KRISTINA OLINE FINSTAD
9  (Deceased), and RYAN SIMS,
10 individually.

11                          Plaintiffs,
           v.
12
   UNITED STATES OF AMERICA,
13
                           Defendant.
14

15      Plaintiffs NANCY FIEDLER, MATTHEW REID GUINEY, OLGA
16 FAYNSHTEYN, KATIE OSBORNE, CHRISTINA QUITASOL, SARMA
17 WILLIAMS, CHRISTINE ALEXANDRA DIGNAM, JASMINE LORD,
18 VICTORIA ELLEN MOORE, YUKA OHASHI MERRITT, VIKRAM SINGH,
19 NINA HUTTEGGER, YADIRA ALVAREZ, SEJAY TAN, NEAL BALTZ,
20 ANTHONY BEITZINGER, SHRUTI DEOPUJARI, ATLEE FRITZ, SEEMA
21 SHARMA, MARGARET STROM, RICHARD LIU, SUSANA SOLANO
22 ROSAS, ARIEL TAKVAM, DOMINIC SELGA, ROBERT KURTZ, CHERIE
23 McDONOUGH, JEAN ALLEN, DANIEL POH-HOCK CHUA acting as the
24 Personal Representatives of the Estates of their respective Decedents, and RYAN
25 SIMS, acting individually, who herewith complain of Defendant UNITED STATES
26 OF AMERICA, and allege as follows:
27

28

## PRELIMINARY ALLEGATIONS

*(Maritime jurisdiction under SIAA)*

1.  Subject matter jurisdiction lies in this Court under 28 U.S.C. § 1333, Fed.R.Civ.P. 9(h), and the Suits in Admiralty Act, 46 U.S.C. §§ 30901-30918, as hereinafter more fully appears.

2.  As is hereinafter more fully set forth, this action grows out of the catastrophic fire that killed thirty-four people aboard the dive vessel *CONCEPTION* (O.V.N. 638133) during the early morning hours of September 2, 2019.

3.  The incident which gave rise to this lawsuit is subject to admiralty tort jurisdiction in that: It occurred upon the navigable waters of the Pacific Ocean within the territorial waters of the State of California less than one marine league from the shores of Santa Cruz Island; It had an actual and potential impact on maritime commerce, and; It involved a traditional maritime activity.

*(Parties, Personal Jurisdiction and Venue)*

**Plaintiffs and Their Beneficiaries**

4.  At all times material hereto, Plaintiff NANCY FIEDLER ("Plaintiff FIEDLER") was and still is an adult resident of the State of California. Plaintiff FIEDLER is the mother of LISA FIELDER, Deceased ("DECEDENT FIEDLER"), and a "parent" as that term is used in 46 U.S.C. § 30302. Plaintiff FIEDLER is also the duly appointed Personal Representative of DECEDENT FIEDLER's Estate.

5.  DECEDENT FIEDLER was born in 1967. At all times material hereto, she was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215 (1996). As hereinafter more fully appears, she died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards from shore and within the territorial limits of the State of

California. See *Tidewater*,14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

6.   MARVIN FIEDLER is DECEDENT FIEDLER's father and a "parent" as that term is used in 46 U.S.C. § 30302.

7.   At all times material hereto, Plaintiff ROBERT KURTZ ("Plaintiff KURTZ") was and is the father of ALEXANDRA HALEY KURTZ, Deceased ("DECEDENT KURTZ"), and a "parent" as that term is used in 46 U.S.C. § 30302. Plaintiff KURTZ is also the Personal Representative of DECEDENT KURTZ's Estate.

8.   At all times material hereto, Plaintiff CHERIE MCDONOUGH ("Plaintiff MCDONOUGH") was and is the mother of ALEXANDRA HALEY KURTZ, Deceased ("DECEDENT KURTZ"), and a "parent" as that term is used in 46 U.S.C. § 30302. Plaintiff MCDONOUGH is also the Personal Representative of DECEDENT KURTZ's Estate.

9.   DECEDENT KURTZ was born in 1993. At all times material hereto, she was a Jones Act seafarer, who was killed in the course of employment aboard the dive vessel *CONCEPTION*. As hereinafter more fully appears, she died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards from shore and within the territorial limits of the State of California. See *Tidewater*,14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

10.   At all times material hereto, Plaintiff DANIEL POH-HOCK CHUA ("Plaintiff CHUA") was and still is an adult resident of the State of California. Plaintiff CHUA is also the duly appointed Executor of the Estate of KRISTINA OLINE FINSTAD ("DECEDENT FINSTAD").

11.   DECEDENT Finstad was born in 1978. At all times material hereto, she was a "passenger for hire" aboard the dive vessel CONCEPTION as that phrase is

used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215 (1996). As hereinafter more fully appears, she died aboard that vessel during the early morning hours of September 2, 2019, when CONCEPTION caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards from shore and within the territorial limits of the State of California. See Tidewater,14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

12.  At all times material hereto, Plaintiff JEAN ANNE ALLEN ("Plaintiff ALLEN") was and still is an adult resident of the State of California. Plaintiff ALLEN is also the duly appointed Executor of the Estate STEVEN JOHN SALIKA, Deceased ("DECEDENT SALIKA"), Executor of the Estate of CAROL DIANA ADAMIC, Deceased ("DECEDENT ADAMIC"), and Administrator of the Estate of TIA NICOLE ADAMIC SALIKA, Deceased ("DECEDENT ADAMIC SALIKA").

13.  DECEDENT SALIKA was born in 1964. At all times material hereto, he was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215 (1996). As hereinafter more fully appears, he died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards from shore and within the territorial limits of the State of California. See *Tidewater*,14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

14.  DECEDENT ADAMIC was born in 1959. At all times material hereto, she was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215 (1996). As hereinafter more fully appears, she died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less

than one-hundred yards from shore and within the territorial limits of the State of California. See *Tidewater*,14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

15.   DECEDENT ADAMIC SALIKA was born in 2002. At all times material hereto, she was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215 (1996). As hereinafter more fully appears, she died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards from shore and within the territorial limits of the State of California. See *Tidewater*,14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

16.   At all times material SHIRLEY SALIKA was an adult resident of the State of California. SHIRLEY SALIKA is DECEDENT SALIKA's mother and a "parent" as that term is used in 46 U.S.C. § 30302.

17.   At all times material SHIRLEY SALIKA was an adult resident of the State of California. SHIRLEY SALIKA is DECEDENT ADAMIC SALIKA's grandmother, heir and successor-in-interest.

18.   At all times material hereto, JAMES ADAMIC was an adult resident of the State of California. He was the adult brother of DECEDENT ADAMIC and a "sibling" as that term is used in 46 U.S.C. § 30302. JAMES ADAMIC is DECEDENT ADAMIC's heir and successor-in-interest.

19.   At all times material hereto, MARK ADAMIC was an adult resident of the State of California. He was the adult brother of DECEDENT ADAMIC and a "sibling" as that term is used in 46 U.S.C. § 30302.  MARK ADAMIC is DECEDENT ADAMIC's heir and successor-in-interest.

20.   At all times material hereto, ANGELIKA ADAMIC was an adult resident of the State of Colorado. She was the adult sister of DECEDENT ADAMIC and a

"sibling" as that term is used in 46 U.S.C. § 30302.   ANGELIKA ADAMIC is DECEDENT ADAMIC's heir and successor-in-interest.

21.  At all times material hereto, Plaintiff MATTHEW REID GUINEY ("Plaintiff GUINEY") was and is the brother of MARYBETH GUINEY, Deceased ("DECEDENT GUINEY") and the duly appointed Personal Representative of DECEDENT GUINEY's Estate.

22.  DECEDENT GUINEY was born in 1968. At all times material hereto, she was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215 (1996). As hereinafter more fully appears, she died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards from shore and within the territorial limits of the State of California. See *Tidewater*,14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

23.  MARY ELIZABETH GUINEY is DECEDENT GUINEY's mother and a "parent" as that term is used in 46 U.S.C. § 30302.

24.  At all times material hereto, Plaintiff OLGA FAYNSHTEYN ("Plaintiff FAYNSHTEYN") was and is the mother of YULIYA KRASHENNAYA, Deceased ("DECEDENT KRASHENNAYA") and a "parent" as that term is used in 46 U.S.C. § 30302. Plaintiff FAYNSHTEYN is also the duly appointed Personal Representative of DECEDENT KRASHENNAYA's Estate.

25.  DECEDENT KRASHENNAYA was born in 1979. At all times material hereto, she was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215 (1996). As hereinafter more fully appears, she died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off

Santa Cruz Island, less than one-hundred yards from shore and within the territorial limits of the State of California. See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

26.   GREGORY KRASHENNY is DECEDENT KRASHENNAYA's father and a "parent" as that term is used in 46 U.S.C. § 30302.

27.   At all times material hereto, Plaintiff KATIE OSBORNE ("Plaintiff OSBORNE") was and is the sister of DANIEL GARCIA, Deceased ("DECEDENT GARCIA") and is the duly appointed Personal Representative of DECEDENT GARCIA's Estate.

28.   DECEDENT GARCIA was born in 1973. At all times material hereto, he was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215 (1996). As hereinafter more fully appears, he died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards from shore and within the territorial limits of the State of California. See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

29.   HENRY GARCIA is DECEDENT GARCIA's father and a "parent" as that term is used in 46 U.S.C. § 30302.

30.   ELLEN GEHRINGER is DECEDENT GARCIA's mother and a "parent" as that term is used in 46 U.S.C. § 30302

31.   At all times material hereto, Plaintiff CHRISTINA QUITASOL ("Plaintiff QUITASOL") was and still is an adult resident of the State of California. Plaintiff QUITASOL is the daughter of MICHAEL QUITASOL, Deceased ("DECEDENT MICHAEL QUITASOL"). She is also the duly appointed Personal Representative of DECEDENT QUITASOL's Estate.

32.   DECEDENT QUITASOL was born in 1956. At all times material hereto,

he was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215 (1996). As hereinafter more fully appears, he died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards from shore and within the territorial limits of the State of California. See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

33.   At all times material hereto, Plaintiff SARMA WILLIAMS ("Plaintiff WILLIAMS") was and still is an adult resident of the State of California. Plaintiff WILLIAMS is the husband of VAIDEHI DEVI CAMPBELL WILLIAMS, Deceased ("DECEDENT WILLIAMS") and is a "spouse" as that term is used in 46 U.S.C. § 30302. He is also the duly appointed Personal Representative of DECEDENT WILLIAMS's Estate.

34.   DECEDENT WILLIAMS was born in 1977. At all times material hereto, she was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215 (1996). As hereinafter more fully appears, she died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards from shore and within the territorial limits of the State of California. See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

35.   MAKANI WILLIAMS is DECEDENT WILLIAMS's daughter and a "child" as that term is used in 46 U.S.C. § 30302. She was born in 2008.

36.   DAELEN WILLIAMS is DECEDENT WILLIAMS's son and a "child" as that term is used in 46 U.S.C. § 30302. She was born in 2011.

37.   At all times material hereto, Plaintiff CHRISTINE ALEXANDRA

DIGNAM ("Plaintiff DIGNAM") was and still is an adult resident of the State of California.   She was the wife of JUSTIN CARROLL DIGNAM, Deceased ("DECEDENT DIGNAM") and a "spouse" as that term is used in 46 U.S.C. § 30302. She is also the duly appointed, Personal Representative of DECEDENT's Estate and the mother of his two children.

38.   DECEDENT DIGNAM was born in 1960.  At all times material hereto, he was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR § 101.105  and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215 (1996).  As hereinafter more fully appears, he died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz, Island, less than a few-hundred yards from shore, within the territorial limits of the State of California.  See *Tidewater Marine Western, Inc. v. Bradshaw* (1996)14 Cal.4th 557, 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

39.   TAYLOR ALEXANDRA DIGNAM is DECEDENT DIGNAM's daughter and a "child" as that term is used in 46 U.S.C. § 30302.  She was born in 1994.

40.   CHANDLER JOHN DIGNAM is DECEDENT DIGNAM's  son and a "child" as that term is used in 46 U.S.C. § 30302.  He was born in 1996.

41. At all times material hereto, Plaintiff JASMINE LORD ("Plaintiff LORD") was and still is an adult resident of the State of California.  She was the wife of CHARLES SPENCER McILVAIN, Deceased ("DECEDENT McILVAIN"), and is a "spouse" as that term is used in 46 U.S.C. § 30302.  She is also the duly appointed, Personal Representative of his Estate.

42.   DECEDENT McILVAIN was born in 1975.  At all times material hereto, he too was a "passenger for hire" aboard the dive vessel *CONCEPTION*, as that phrase is used in 33 CFR § 101.105,  and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. at 215.  As hereinafter more fully appears, he too died aboard that vessel

during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than a few-hundred yards from shore, within the territorial limits of the State of California.  See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

43.  CLARK McILVAIN is DECEDENT McILVAIN's father and a "parent" as that term is used in 46 U.S.C. § 30302.

44.  SUZANNE ADAMS is DECEDENT McILVAIN's mother and a "parent" as that term is used in 46 U.S.C. § 30302.

45.  At all times material hereto, Plaintiff VICTORIA ELLEN MOORE ("Plaintiff MOORE")  was and still is an adult resident of the State of California.  She was the wife of RAYMOND SCOTT CHAN, Deceased ("DECEDENT CHAN"), and is a "spouse" as those terms are used in 46 U.S.C. § 30302.  She is also the mother of his two children and the duly appointed, Personal Representative of the Estates of DECEDENT SCOTT CHAN and KENDRA MOORE CHAN, Deceased ("DECEDENT MOORE CHAN").

46.  DECEDENT SCOTT CHAN was born in 1960.  At all times material hereto, he too was a "passenger for hire" aboard the dive vessel *CONCEPTION*, as that phrase is used in 33 CFR § 101.105,  and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. at 215.  As hereinafter more fully appears, he too died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than a few-hundred yards from shore, within the territorial limits of the State of California.  See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

47.  DECEDENT MOORE CHAN was born in 1993.  She was the daughter of Plaintiff MOORE and DECEDENT CHAN.  At all times material hereto, she too was a "passenger for hire" aboard the dive vessel *CONCEPTION*, as that phrase is used in

1  33 CFR § 101.105,  and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. at
2  215.  As hereinafter more fully appears, she too died aboard that vessel during the
3  early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank
4  upon the navigable waters of Platt's Harbor off Santa Cruz, Island, less than a few-
5  hundred yards from shore, within the territorial limits of the State of California.  See
6  *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

7       48.  KEVIN WILLIAMS CHAN is DECEDENT CHAN's son and a "child"
8  and DECEDENT MOORE CHAN's brother and a "sibling"  as those terms are used
9  in 46 U.S.C. § 30302.

10      49. At all times material hereto, Plaintiff YUKA OHASHI MERITT
11  ("OHASHI MERITT")  was and still is an adult resident of the State of California and
12  is the duly appointed Personal Representative of the Estate of YUKO HATANO,
13  Deceased ("DECEDENT HATANO").

14      50.  DECEDENT HATANO was born in 1979.  At all times material hereto,
15  she too was a "passenger for hire" aboard the dive vessel *CONCEPTION*, as that
16  phrase is used in 33 CFR § 101.105,  and a "non-seafarer" within the meaning of
17  *Yamaha*, 516 U.S. at 215.  As hereinafter more fully appears, she too died aboard that
18  vessel during the early morning hours of September 2, 2019, when *CONCEPTION*
19  caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz
20  Island, less than a few-hundred yards from shore, within the territorial limits of the
21  State of California.  See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2;
22  Gov. Code, § 170, 171).

23      51.  MACHIKO HATANO is DECEDENT HATANO's  mother and a
24  "parent" as that term is used in 46 U.S.C. § 30302.

25      52.  At all times material hereto, Plaintiff VIKRAM SINGH ("SINGH")  was
26  and still is an adult resident of the State of California and is the duly appointed,
27  Personal Representative of the Estate of SUNIL SINGH SANDHU, Deceased
28  ("DECEDENT SINGH SANDHU").

53.  DECEDENT SINGH SANDHU was born in 1973.  At all times material hereto, he too was a "passenger for hire" aboard the dive vessel *CONCEPTION*, as that phrase is used in 33 CFR § 101.105,  and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. at 215.  As hereinafter more fully appears, he too died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than a few-hundred yards from shore, within the territorial limits of the State of California.  See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

54.  SOJIT SINGH s/o UDHAM SINGH is DECEDENT SINGH SANDHU's  father and a "parent" as that term is used in 46 U.S.C. § 30302.

55.  JASBIR KAUR d/o BIKREM SINGH is DECEDENT SINGH SANDHU's mother and a "parent" as that term is used in 46 U.S.C. § 30302.

56.  SUNITA KAUR SANDHU is DECEDENT SINGH SANDHU's sister and a "sibling" as that term is used in 46 U.S.C. § 3032.

57.  Plaintiff NINA HUTTEGGER ("Plaintiff HUTTEGGER") was at all times relevant to this Complaint an adult resident of the State of California. Plaintiff HUTTEGGER is the surviving wife of decedent, JUHA-PEKKA AHOPELTO ("DECEDENT AHOPELTO") and the biological mother of Decedent AHOPELTO's minor son C.A., and DECEDENT AHOLPELTO's adult daughter, JULIA AHOPELTO. Plaintiff HUTTEGGER is the Personal Representative of Decedent AHOLPELTO's Estate.

58.  Decedent AHOPELTO was born in 1969. At all times material hereto, he was a "passenger for hire" aboard the dive vessel CONCEPTION as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha,* 516 U.S. at 215. As hereinafter more fully appears, he died aboard that vessel during the early morning hours of September 2, 2019, when CONCEPTION caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-

SIAA Complaint of Plaintiffs
for Wrongful Death and Survival Damages

hundred yards from shore, within the territorial limits of the State of California. See *Tidewater,* 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

59.   At all times material hereto, Plaintiff JULIA AHOPELTO was at all times relevant to this Complaint an adult resident of the State of California. Plaintiff JULIA AHOPELTO is the surviving daughter of Decedent AHOPELTO.

60.   At all times material hereto, Plaintiff C.A. is the surviving minor son of DECEDENT AHOPELTO.

61.   At all times material hereto, Plaintiff YADIRA ALVAREZ ("Plaintiff ALVAREZ") was and still is an adult resident of the State of California. She was the natural mother of BERENICE FELIPE, Deceased ("DECEDENT FELIPE"). She is also the duly appointed, Personal Representative of DECEDENT FELIPE's Estate.

62.   DECEDENT FELIPE was born in 2002. At all times material hereto, she was "passenger for hire" aboard the dive vessel CONCEPTION as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha Motor Corp., U.S.A. v. Calhoun* ["*Yamaha*"] (1996) 516 U.S. 199, 215. As hereinafter more fully appears, she died aboard that vessel during the early morning hours of September 2, 2019, when CONCEPTION caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one hundred yards from shore, within the territorial limits of the State of California. See *Tidewater Marine Western, Inc. v. Bradshaw* (1996)14 Cal.4th 557,564 (citing Cal. Const., art. III,§ 2; Gov. Code,§ 170, 171).

63.   At all times material hereto, Plaintiff SEJAY TAN ("Plaintiff TAN") was and still is an adult resident of the State of Michigan. He is the brother of WEI TAN, deceased ("DECEDENT TAN") and the duly appointed, Personal Representative of DECEDEDENT TAN's Estate.

64.   DECEDENT TAN was born in 1993. At all times material hereto, she too was a "passenger for hire" aboard the dive vessel *CONCEPTION*, as that phrase is used in 33 CPR§ 01.105, and a "non-seafarer" within the meaning of *Yamaha*, 516

U.S. at 215. As hereinafter more fully appears, she too died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards from shore, within the territorial limits of the State of California. See *Tidewater*, 14 Cal.4th at 564 ( citing Cal. Const., art. III, § 2; Gov. Code, §170,171).

65.   CHENG LENG TAN is DECEDENT TAN's natural father and a "parent" as that term is used in 46 U.S.C. § 30302.

66.   CHIK PING YAP is DECEDENT TAN's natural mother and a "parent" as that term is used in 46 U.S.C. § 30302.

67.   At all times material hereto, Plaintiff ERIC BALTZ ("Plaintiff BALTZ") was and still is an adult resident of the State of Missouri. He was the brother and a "sibling" of NEAL BALTZ, Deceased ("DECEDENT BALTZ") as that term is used in 46 U.S.C. § 30302. He is the duly appointed Personal Representative of DECEDENT BALTZ's Estate.

68.   At all times material hereto, DECEDENT BALTZ was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215 (1996). As hereinafter more fully appears, he died aboard that vessel during the early morning hours of September 2, 2019, when CONCEPTION caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards from shore, within the territorial limits of the State of California. See *Tidewater*.14 Cal.4th 557, 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

69.   CANDACE BALTZ is DECEDENT BALTZ's mother and a "parent" as that term is used in 46 U.S.C. § 30302.

70.  At all times material hereto, Plaintiff ANTHONY BEITZINGER ("Plaintiff BEITZINGER") was and still is an adult resident of the State of Ohio. He was the brother and a "sibling" of PATRICIA BEITZINGER, Deceased

("DECEDENT BEITZINGER") as that term is used in 46 U.S.C. § 30302. He is the duly appointed Personal Representative of DECEDENT BEITZINGER's Estate.

71.   At all times material hereto, DECEDENT BEITZINGER was a "passenger for hire" aboard the dive vessel CONCEPTION as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha,* 516 U.S. 199, 215 (1996). As hereinafter more fully appears, she died aboard that vessel during the early morning hours of September 2, 2019, when CONCEPTION caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one hundred yards from shore, within the territorial limits of the State of California. See *Tidewater,* 14 Cal.4th 557, 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

72.   ELIZABETH BEITZINGER is DECEDENT BEITZINGER's mother and a "parent" as that term is used in 46 U.S.C. § 30302.

73.   At all times material hereto, Plaintiff SHRUTI DEOPUJARI ("Plaintiff DEOPUJARI") was and still is an adult resident of the State of Virginia. She is the duly appointed Personal Representative of the Estate of SANJEERI DEOPUJARI ("DECEDENT DEOPUJARI").

74.   At all times material hereto, DECEDENT DEOPUJARI was a "passenger for hire" aboard the dive vessel CONCEPTION as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215 (1996). As hereinafter more fully appears, she died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one hundred yards from shore, within the territorial limits of the State of California. See *Tidewater,* 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

75.   SATISH DEOPUJARI is DECEDENT DEOPUJARI's father and a "parent" as that term is used in 46 U.S.C. § 30302.

76.   SANDHYA DEOPUJARI is DECEDENT DEOPUJARI's mother and a parent" as  that term is used in 46 U.S.C. § 30302.

77.  At all times material hereto, Plaintiff ATLEE FRITZ ("Plaintiff FRITZ") was and  still is an adult resident of the State of Texas. He was the father and "parent" of ANDREW FRITZ, Deceased ("DECEDENT FRITZ") as those terms are used in 46 U.S.C. § 30302. He is the duly appointed Personal Representative of DECEDENT FRITZ's Estate.

78.  At all times material hereto, DECEDENT FRITZ was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha,* 516 U.S. at 215. As hereinafter more fully appears, he died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards from shore, within the territorial limits of the State of California. See *Tidewater*, Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

79.  LINDA FRITZ is DECEDENT FRITZ's mother and a "parent" as that term is used in 46 U.S.C. § 30302.

80.  At all times material hereto, Plaintiff SEEMA SHARMA ("Plaintiff SHARMA") was and still is an adult resident of the State of Ohio. She is the duly appointed Personal Representative of the Estate of KAUSTUBH NIRMAL ("DECEDENT NIRMAL").

81. At all times material hereto, DECEDENT NIRMAL was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. at 215 (1996). As hereinafter more fully appears, he died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards from shore, within the territorial limits of the State of California. See *Tidewater,* 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

82.  PATANJALI SHARMA is DECEDENT NIRMAL's father and a "parent"

as that term is used in 46 U.S.C. § 30302.

83.   LAKSHMI SHARMA is DECEDENT NIRMAL's mother and a "parent" as that term is used in 46 U.S.C. § 30302.

84.   At all times material hereto, Plaintiff MARGARET STROM ("Plaintiff STROM") was and still is an adult resident of the State of Tennessee. She was the wife and "spouse" of TED STROM, Deceased ("DECEDENT STROM") as those terms are used in 46 U.S.C. § 30302. She is also the mother of his two children and the duly appointed Personal Representative of DECEDENT STROM's Estate.

85.   At all times material hereto, DECEDENT STROM was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215 (1996). As hereinafter more fully appears, he died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards from shore, within the territorial limits of the State of California. See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

86.   KESTREL STROM is DECEDENT STROM's son and a "child" as that term is used in 46 U.S.C. § 30302.

87.   PFEIFFER STROM is DECEDENT STROM's son and a "child" as that term is used in 46 U.S.C. § 30302.

88.   At all times material hereto, Plaintiff RICHARD X. LIU ("Plaintiff LIU") was and still is an adult resident of the State of California. He is the duly appointed Personal representative of the Estate of XIANG LIN, (Deceased).

89.   Decedent XIANG LIN (hereinafter "DECEDENT LIN") was born in 1973. At all times material hereto, she was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha,* 516 U.S. at 215. As hereinafter more fully appears, she died aboard that vessel during the early morning hours of September 2, 2019, when

19

*CONCEPTION* caught fire and sank upon the navigable waters of Platts Harbor off Santa Cruz Island, less than one-hundred yards from shore, within the territorial limits of the State of California. See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

90.   YIN LIN and ANZHI CHEN are residents of the People's Republic of China and are "parent[s]" of DECEDENT, as the term is used in 46 U.S.C. § 30302.

91.   At all times material hereto, Plaintiff SUSANA SOLANO ROSAS was and is an adult resident of the State of California and is the natural mother of DECEDENT EVANMICHEL SOLANO QUITASOL ("DECEDENT EVANMICHAEL QUITASOL"), ANGELA ROSE SOLANO QUITASOL ("DECEDENT ANGELA SOLANO QUITASOL"), and NICOLE STORM SOLANO QUITASOL ("DECEDENT NICOLE QUITASOL"). The Decedents were the adult daughters of Plaintiff SUSANA SOLANO ROSAS.  Plaintiff SUSANA SOLANO ROSAS is the duly appointed personal representative of the Decedents' respective estates, and is a "parent" as that term is used in 46 U.S.C. § 30302.

92.   DECEDENT EVANMICHAEL QUITASOL was born July 31, 1982. DECEDENT ANGELA SOLANO QUITASOL was born July 26, 1991. DECEDENT NICOLE QUITASOL was born January 4, 1998. At all times material hereto, each of those DECEDENTS was a "passenger for hire," as that phrase is used in 33 CFR §101.105, aboard the dive vessel *CONCEPTION*. Those DECEDENTS were "non-seafarers" within the meaning of *Yamaha*, 516 U.S. at 215 (1996). As hereinafter more fully appears, those DECEDENTS perished aboard that vessel during the early morning hours of September 2, 2019, when it caught fire and sank in Platt's Harbor off Santa Cruz Island, upon navigable waters within the territorial limits of the State of California. See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

93.   At all times material hereto, Plaintiff ARIEL TAKVAM was an adult resident of the State of California.  She was the spouse of KRISTIAN TAKVAM,

Deceased ("DECEDENT TAKVAM") and is a "spouse" as that term is used in 46 U.S.C. § 30302.   She is also the duly appointed, Personal Representative of DECEDENT TAKVAM's Estate.

94.   At all times material hereto, Plaintiff KENNETH TAKVAM was an adult resident of the State of Texas.   KENNETH TAKVAM was the natural father of DECEDENT TAKVAM and is a "parent" as that term is used in 46 U.S.C. § 30302.

95.   At all times material hereto, Plaintiff MARY R. TAKVAM was an adult resident of the State of Texas.   She was the natural mother of DECEDENT TAKVAM, is a "parent" as that term is used in 46 U.S.C. § 30302, and is the duly appointed Personal Representative of DECEDENT TAKVAM's Estate.

96.   At all times material hereto, DECEDENT TAKVAM was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha,* 516 U.S. at 215.   As hereinafter more fully appears, he died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards from shore, within the territorial limits of the State of California.   See *Tidewater,* 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

97.   Plaintiff, DOMINIC MICAEL SELGA was and still is an adult resident of the State of California.   He is the natural son of FERNISA JUNE SISON (Deceased) ("DECEDENT SISON), a "child" as that term is used in 46 U.S.C. § 30302, and the duly appointed Personal Representative of said DECEDENT's Estate.

98.   At all times material hereto, DECEDENT SISON was a "passenger for hire" aboard the dive vessel *CONCEPTION,* as that phrase is used in 33 CFR § 101.105, and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. at 215.   As hereinafter more fully appears, she too died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred

yards from shore, within the territorial limits of the State of California. See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

99.   NISA SHINAGAWA is the natural daughter of DECEDENT SISON and a "child" at that term is used in 46 U.S.C. § 30302.

100. At all times material hereto, Plaintiff RYAN SIMS ("Plaintiff SIMS") was and still is an adult resident of the State of California.   Plaintiff SIMS was a member of *CONCEPTION's* crew when she caught fire and sank upon the navigable waters of Platts Harbor off Santa Cruz, Island.

### The Defendant

101. At all times material hereto, the UNITED STATES COAST GUARD (hereinafter "COAST GUARD") was and still is a military, multi-mission, maritime service within the Department of Homeland Security, one of the five armed services of Defendant the UNITED STATES OF AMERICA, and an "agent of the UNITED STATES" within the meaning of 46 U.S.C. § 30904.  As such the UNITED STATES OF AMERICA is designated Defendant herein ("UNITED STATES").

102. Venue is properly laid in this Court under 28 U.S.C. § 1391(b)(2) in that Defendant's acts and omissions complained of herein occurred within the federal judicial district of this Honorable Court.

### OPERATIVE FACTS

(*The Small Passenger Vessel CONCEPTION*)

103. At all times material hereto, Truth Aquatics, a California-organized business, owned by Richard Glen Fritzler and Dana Jeanne Fritzler ("Truth Aquatics" and "the Fritzlers") built, owned, operated, maintained, manned, equipped, controlled, and operated three "small passenger vessels" within the meaning of 46 C.F.R., Subchapter T – *CONCEPTION, VISION*, and *TRUTH*.  Although *VISION* was five feet longer and one foot wider than *CONCEPTION,* they were sisterships in the sense that the layout and general arrangement of their decks, deck houses, and below deck compartments were very similar.

104. *CONCEPTION* was designed, built, furnished, equipped, inspected, and launched in Long Beach, California in 1981 by the Fritzlers and others, and was redesigned, rebuilt, refurbished, reequipped, relaunched by the Fritzlers and others, in 2005 and/or subsequent years. When C*ONCEPTION* was launched in 1981, she was subject to Coast Guard inspection and certification under 46 C.F.R. § 175.100(a) and was indeed inspected and certificated by the Coast Guard acting for Defendant UNITED STATES by and through a duly authorized Officer in Charge of Marine Inspection ("OCMI").

105. *CONCEPTION* was likewise subject to Coast Guard inspection and certification at the time of her redesign and reconstruction in 2005 and was indeed reinspected and recertificated at that time by the Coast Guard acting for Defendant UNITED STATES by and through a duly authorized OCMI.

106. From the time *CONCEPTION* first entered service in 1981 until the date of the catastrophic fire which is the subject of this action, said vessel was further subject to annual inspection and certification under 46 C.F.R. §§ 175.100(a), and 185.726, *inter alia,* and was indeed inspected and certificated annually by the Coast Guard acting for Defendant UNITED STATES by and through a duly authorized OCMI.  In addition to said annual inspections, Defendant UNITED STATES also conducted 5-year COI renewal inspections and biannual hull and structural examinations aboard *CONCEPTION* pursuant to 46 C.F.R. § 176.600 *inter alia.*  The OCMI's who inspected and certificated *CONCEPTION* pursuant to those regulations during the years immediately preceding the catastrophe that is the subject of this incident, were members of the Marine Safety Detachment ("MSD") in Santa Barbara, a sub-unit of the MSD for Coast Guard Sector LA/Long Beach.

107. The Coast Guard developed, adopted, promulgated, published, and updated a T-Boat Inspection Book ("CG-840 TI") which not only prescribes the procedures and protocols for all those inspections, examinations, and certifications but also provides OCMI's with written procedures, protocols, and checklists for such

inspections, examinations, and certifications.  The CG-840-T1 and its procedures, protocols, and checklists were last updated in 2011.  In addition to the procedures, protocols, and checklists set forth in the CG-840-TI, the MSD in Santa Barbara prepared, published, adopted, issued, and updated its own supplemental procedures, protocols, and checklists for small-passenger-vessel inspections and examinations like the ones described hereinabove.  The supplemental procedures, protocols, and checklists published by the Santa Barbara MSD were last updated in 2014.

108.  A copy of the Supplemental Procedures Check List referenced herein is attached to the Complaint as Exhibit "A."

109. Among other things, the procedures, protocols, and checklists described in Paragraphs 107 and 108 hereinabove required the OCMI's to inspect and certificate *CONCEPTION's* wiring and electrical systems to ensure that they complied with the standards set forth in 46 C.F.R. § 183.340.  They also called upon the OCMI's to ensure that small passenger vessels like *CONCEPTION* were equipped with proper fire detection and suppression systems and suitable passenger evacuation hatches and passages.  Having developed, adopted, promulgated, published, and issued those procedures, protocols, and checklists, the MSD's for Coast Guard Sector LA/Long Beach and sub-unit Santa Barbara and their OMCI's had a manifest duty to comply with said procedures, protocols, and checklists and had no discretion to violate or disregard them.

110. The Coast Guard, acting by and through its aforesaid MSD's and duly designated OCMI's documented each of the inspections, examinations, and certifications described hereinabove with a dated Certificate of Inspection ("COI"). The MSD in Santa Barbara issued *CONCEPTION* her last COI on or about November 19, 2014, and conducted an annual inspection in 2019, prior to *CONCEPTION* burning to the waterline in the catastrophe that is the subject of this action.  As hereinafter more fully appears, that COI authorized *CONCEPTION* to operate as "a small passenger vessel" within the meaning of 46 C.F.R. § 175.110(a) at all times

material hereto, and to carry up to forty-five passengers on overnight voyages along the Southern California coast, even though her electrical wiring and systems, her fire detection and suppression systems, and her passenger-accommodation escape hatch were in open and obvious violation of the procedures, protocols, and checklists described in Paragraph 107 and 108 hereinabove.

111. Beginning in 2013, the Coast Guard started publishing Navigation and Vessel Inspection Circulars ("NVIC's") and safety alerts about dangers of circuit overloads and shipboard fires caused by the use of power strips and rechargeable devices aboard small passenger vessels.

112. After the catastrophe that is the subject of this action, the Coast Guard inspected *CONCEPTION's* sistership *VISION*, applying the same procedures, protocols, and checklists the OCMI's of MSD Santa Barbara should have applied to *CONCEPTION*, and discovered numerous glaring deficiencies in *VISION's* wiring and electrical systems, fire detection and suppression systems, and passenger-accommodation escape hatch.

113. *CONCEPTION*, which is depicted below, was constructed of wood and fiberglass. She had a registered tonnage of 66 net tons and as of September 2, 2019, was licensed by the Coast Guard to carry up to six crew members and one hundred passengers for hire and to conduct overnight, near-coastal voyages upon the territorial, near coastal waters of the Santa Barbara Channel



SIAA Complaint of Plaintiffs
for Wrongful Death and Survival Damages

114. As designed, built, equipped, redesigned, rebuilt, and refurbished, *CONCEPTION* had three decks.  The pilothouse and sleeping quarters for five of her crew members were located on the vessel's uppermost, or "sun deck," atop the main-deck house, and were accessed from the main deck by a single set of open stairs situated at the after end of the deck house.  Exterior walkways ran along the main deck on either side of the house and provided access to the bow.  The dive station was situated on the main deck's open "fantail" area aft of the house.  The stern of the vessel was equipped with a dive platform that could be raised and lowered and when



raised, also functioned as a "skid" or cradle for *CONCEPTION's* fifteen-foot inflatable skiff.

*Galley with forward windows*

115. The passenger accommodations were distributed between the main-deck and below-deck areas.  The interior of the main-deck house comprised an open area that was divided into two zones or spaces by low counters and fixed furniture.  The forward one-third of that space housed "the galley" and its electrically powered food-storage and food-preparation equipment. The after two-thirds of the space comprised "the salon" where passengers socialized and ate their meals.  A set of fixed counters equipped with food-

**MAIN DECK**

SIAA Complaint of Plaintiffs
for Wrongful Death and Survival Damages

service platforms, built-in coolers, and an ice maker ran down the centerline of the salon. Banquette-style seating and a row of padded sofas were built into the port and starboard walls of the salon. Wooden tables and plastic chairs sat inboard of the banquettes and sofas. The salon and all of its furnishings were flammable, including the carpeting on the deck and the acoustic tile on the overhead.

116. The galley/salon space was accessed from the main deck by a doorway at the after end of the deck house which led to and from the dive station and the open fantail. That entry/exit was equipped with a set of double doors which were always kept open while the vessel lay at anchor.

117. The main-deck house also embraced three separately enclosed "heads" or toilets. Two of those heads were accessed via flanking doorways on the port and starboard sides of the main deck entry. The third head was located on the starboard side of the deck house and was accessed from an exterior doorway situated at the bottom of the stairway up to the sun deck.



*Salon looking forward towards galley area*

SIAA Complaint of Plaintiffs
for Wrongful Death and Survival Damages

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





*The bunk room below deck*

118. All the passenger accommodations were located below the main deck, within the hull itself, and comprised a bunk room and a shower room separated by a watertight, thwartship bulkhead.  The cramped bunk room was located aft of the shower room and designed to accommodate forty-five passengers and one crew member in a space that was approximately twenty-one feet long and twenty-five feet wide.  Thirteen of the bunks in that compartment were designed for double occupancy and twenty for single occupancy.

119. Twelve of the double-occupancy bunks were divided into two flights, one above the other, and arranged along each side of the bunk room, six to a side.  Twelve single-occupancy bunks were arranged longitudinally, in the middle of the room, in a block that ran two bunks wide, two bunks long, and three bunks high.  A thwartship block of single-occupancy bunks running three high and two long sat against the after

28
SIAA Complaint of Plaintiffs
for Wrongful Death and Survival Damages

bulkhead.  Viewed from above, the layout resembled a three-pronged fork, where the outside tangs were double bunks, the center tang was the longitudinal set of double bunks, and the base of the fork was the smaller, thwartship block of singles.  The thirteenth double bunk was tucked under the access companionway at the forward end of the bunk room, and the last two single-occupancy bunks were stacked atop one another against the port side of the forward bulkhead.  All the bunks were framed in wood and equipped with reading lights, plastic-covered foam mattresses, pillows, and blankets.  Privacy was provided by thin wooden partitions and cloth curtains.  During the accident voyage, all thirteen of the double bunks and sixteen of the twenty singles were assigned to couples or individuals.  The unassigned bunks all lay in the thwartship block that sat against the after bulkhead.  The bunk room had no windows, portholes, or skylights.  Ventilation was provided by a forced-air system with intakes on the main deck and an air-conditioning system that cooled and recirculated interior air.

120.  Over the years, undocumented and ill-designed modifications were added to the forced-air ducting and compartment overhead.  Lighting in the aisles was fluorescent.  There were two, residence-grade smoke alarms and one emergency light in the bunk room.  Each alarm operated independently of the other, and neither sent a signal to the pilothouse.  There was a single, ten-pound, Class ABC fire extinguisher housed at the forward end of the bunk room but no other fire-fighting systems or equipment in that compartment.  There were only two means of access to and egress from the bunk room, and neither opened directly onto a weather deck.  There was a narrow, curved companionway equipped with stairs that spiraled down to the forward end of the bunk room from the starboard side of the galley.  There was also a closed and unmarked, twenty-two-inch-by-twenty-two-inch emergency-escape hatch tucked into the overhead above the aftermost berths in the longitudinal block of single bunks which opened onto a cramped space beneath the aftermost counter in the salon.  By virtue of its repeated inspection of *CONCEPTION*, the Coast Guard was aware of

SIAA Complaint of Plaintiffs
for Wrongful Death and Survival Damages

these conditions.

121. The open fantail area at the after end of *CONCEPTION's* main deck was equipped with center-line storage banks for dive equipment such as fins, masks, and SCUBA bottles.  The below-deck space immediately beneath the fantail was divided into two compartments.  The forward compartment housed the "engine room" and abutted the after end of and was separated from the bunk room by a ½-inch thick plywood bulkhead.  That compartment contained the two diesel engines that turned the vessel's twin propellors, two fuel tanks, air compressors for filling the SCUBA bottles, and an auxiliary diesel generator that powered the vessel's electrical system. The after compartment or "lazarette" lay between the engine room and the vessel's transom.  The lazarette housed a nitrox system for producing oxygen-enriched dive air and a storage area for drying wet suits.   Access to and from the engine room and the lazarette was provided through two separate hatches located on the fantail.

122. As designed, built, equipped, launched, inspected, certificated, redesigned, rebuilt, refurbished, reequipped, reinspected, and recertified by, *CONCEPTION* was equipped with an onboard electrical system that was powered by diesel generators.  That electrical system did not fully and/or adequately comply with the standards set forth under 46 CFR 183.340. For example, some electrical items in the bunkroom were not composed of UL Boat or Marine cable called for by such standards, but rather of cheap, everyday Romex wire of the kind one would buy at Home Depot.

123. The vessel's inadequate electrical system was already stressed by the addition of the nitrox generation system to the point where the galley stove and the nitrox system could not be operated at the same time.   Based on the information the OCMI's gathered in the inspections, examinations, and certifications described hereinabove, the Coast Guard knew, or in the exercise of ordinary care should have known, that Truth Aquatics and the Fritzlers not only added undocumented and ill-designed electricalutlets throughout the vessel for the purpose of battery charging but

SIAA Complaint of Plaintiffs
for Wrongful Death and Survival Damages

also permitted and even encouraged passengers and crew members like DECEDENTS to use *CONCEPTIONS's* electrical system to charge digital cameras, video-cameras, smartphones, cell phones, strobe lights, Go Pros, lap top tablets, underwater-scooter power packs, CPAP machines, and other lithium battery-powered electronic equipment

(<em>The Events Leading Up to the Incident</em>)



124. The risk of fire caused or accelerated by the presence of lithium-based batteries is well documented by official studies and mainstream media. Many types of lithium-battery-powered equipment have long been banned from commercial airliners. Between 2006 and 2021, the Federal Aviation Administration, an agency of Defendant UNITED STATES, alone recorded 310 air or airport fire incidents involving lithium batteries. The Consumer Product Safety Commission, also an agency of Defendant UNITED STATES, recorded numerous incidents of lithium battery fires during the same period. More pertinently, on the late afternoon of March 9, 2013, over six years before the fatal fire that is the subject of this action, the *CONDOR EXPRESS*, another "small passenger vessel" within the meaning of 46 C.F.R.§ 175.110(a), caught fire while berthed in Santa Barbara Harbor when the

battery charging station for that vessel's portable maritime radio burst into flames inside her wheelhouse.

125. During the pre-dawn hours of October 8, 2018, eleven months before the fatal fire that is the subject of this action, Ken Dehler, an off-duty fireman and a passenger aboard *CONCEPTION*'s sistership *VISION*, heard a "hissing" noise and then a loud "bang" inside that vessel's main deckhouse and discovered sparks, flames, and smoke emanating from two lithium-based batteries that were nested in a charging station plugged into a power strip sitting among paperback books atop a shelf on the starboard side of the *VISION's* salon. After Dehler and another passenger who just happened to be awake smothered the fire with a dry chemical extinguisher from the galley, they unplugged the charger and threw it into a rinse bin located out on the main deck. Dehler and the other passenger promptly reported the fire to the *VISION's* master who reported it in turn to his employers.

126. On Monday, August 31, 2019, DECEDENTS, and each of them, departed Santa Barbara Harbor aboard *CONCEPTION*, along with Plaintiff SIMS and five other crew members, for a three-day voyage through the Channel Islands ("accident voyage"). That voyage would take *CONCEPTION* "between ports in the United States" as that phrase is used in 46 U.S.C. § 30509(a)(1).

127. On the night of Tuesday, September 1, 2019, while *CONCEPTION* was anchored in Platt's Harbor just a few hundred yards off Santa Cruz Island, some of her passengers made a night dive that concluded some time before 2400. After that, the vessel buttoned down for the night. At 0235 hours, the last person awake, *CONCEPTION's* Second Cook Michael Kohls, finished cleaning the salon, galley, and heads and went up to his bunk on the sun deck. There was no indication at that time of any fire or disturbance in the bunk room, on the fantail, in the salon, in the galley, or anywhere else aboard the vessel. By the time Kohls nodded off in his berth, everyone aboard *CONCEPTION,* including all six of her crew members, was sound asleep.

128. Sometime around 0300, Kohls and his fellow crew member, First Cook Ryan Sims, were awakened by loud noises and the cry of someone in distress. Earlier that evening, Sims had seen sparks when he plugged his cell phone into one of the charging stations in the salon. Kohls got up to investigate, but when he reached the top of the stairway from the sun deck down to the main deck, he saw flames licking at the stairs from the after, starboard corner of the passenger accommodation. What Kohls saw was a lithium-fueled fire that had been sparked and/or critically accelerated by defective equipment which was plugged into an overburdened shipboard electrical system. This overburdened shipboard electrical system had been designed, developed, built, installed, and refurbished without adequate fire detection, without adequate fire protection and/or without adequate electrical systems and wiring by the Fritzlers, Truth Aquatics, and others, and inspected and approved by the Coast Guard and Defendant the UNITED STATES. Nevertheless, at all times material, the Coast Guard failed to perform adequate inspections, allowing CONCEPTION to sail with these hazardous and ultimately deadly conditions.

129. Lithium-fueled fires are subject to the well-known phenomenon of "thermal runaway" and can quickly generate temperatures in excess of 1000 degrees Fahrenheit. As soon as Kohls saw the fire licking at the bottom of the after stairway, he ran forward along the sun deck and alerted Capt. Jerry Boylan and the rest of the crew. After Boylan made a MAYDAY call at 0314 from *CONCEPTION's* pilothouse, he, Kohls, Sims, First Mate Cullen Molitor, and Deck Hand Milton French realized that the fire had accelerated beyond their control and abandoned ship, taking *CONCEPTION's* fifteen-foot inflatable skiff with them. Apart from passenger Berenice Felipe -- whom Kohls had apparently heard cry out as she pushed open the escape directly above her bunk and fled overboard through the fire – everyone else aboard *CONCEPTION* was trapped down below in the bunk room where they died from the combined effects of fire and asphyxiation after trying to fight the blaze with the fire extinguisher in the cabin.

SIAA Complaint of Plaintiffs
for Wrongful Death and Survival Damages

## **FIRST CAUSE OF ACTION**

*(Wrongful Death against Defendant UNITED STATES OF AMERICA)*

130. Plaintiffs hereby refer to, and incorporate as though fully set forth herein, each and every allegation set forth in each paragraph hereinabove.

131. This cause of action arises under the Suits in Admiralty Act, 46 U.S.C. §§ 30901-30918, and the General Maritime Law of the United States as handed down in *Moragne v. States Marine Lines, Inc*., 398 U.S. 375 (1970), *Sea-Land Services v. Gaudet*, 414 U.S. 573 (1974), *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811 (2001), and *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996),*inter alia*.

132. Defendant UNITED STATES would, if a private person, be liable to the Plaintiffs and DECEDENTS' heirs-at-law in that the Coast Guard and its duly designated OMCI's acted negligently and carelessly at all times material hereto by:

        a.    Abusing their discretion pursuant to Title 46 of the Code of Federal Regulations, Subchapter T, Parts 175 to 187 - governing the inspection and operation of small passenger vessels (less than 100 gross tons) carrying between 6 and 150 passengers overnight;

        b.      Ignoring, disregarding, and failing to abide by the procedures, protocols, and checklists set forth in the CG-840-T1 and the supplemental publications issued by the MSD; and

        c.      Certificating and authorizing *CONCEPTION* to operate as "a small passenger vessel" within the meaning of 46 C.F.R. § 175.110(a) at all times material hereto, and to carry up to forty-five passengers on overnight voyages along the Southern California coast, even though her electrical wiring and systems, her fire detection and suppression systems, her passenger-accommodation escape hatch, her watch logs and training logs were in open and obvious violation of those procedures, protocols, and checklists.

133. As a direct, proximate, and legal result of the hereinabove delicts of Defendant, and each of them, DECEDENTS and each of them died as a consequence of the fire, due to a combination of burns, smoke inhalation, and asphyxiation.

134. As a direct, proximate, and legal result of the death of DECEDENTS, and each of them, Plaintiffs,  the respective Estates they represent, and DECEDENTS heirs and beneficiaries, have suffered and will continue to suffer the permanent loss of said DECEDENTS' services, support, nurture, counsel, and example all to their pecuniary damage in an amount to be proven at the time of trial.

135. As a direct, proximate, and legal result of the death of DECEDENTS, and each of them, Plaintiffs, the respective Estates they represent, and DECEDENTS heirs and beneficiaries, have suffered and will continue to suffer the permanent loss of said DECEDENTS' love, society, affection, care, comfort and consortium, all to their non-pecuniary damage in an amount to be proven at the time of trial.

WHEREFORE, Plaintiffs pray judgment against Defendant UNITED STATES as is hereinafter set forth.

      ///

## SECOND CAUSE OF ACTION
(Survival Action)

136. Plaintiffs herewith refers to and by that reference incorporates, as though fully set forth herein, each and every allegation set forth hereinabove.

137. On or about September 2, 2019, before the foregoing cause of action arose in DECEDENTS' favor, DECEDENTS, who would have been plaintiffs in this action had they lived, died of smoke inhalation, burns, and asphyxiation secondary to the fire.

138. As a direct, proximate, and legal result of the hereinabove alleged delicts of Defendant, DECEDENTS' Estates incurred expenses for funeral and cremation, all to their Estates' pecuniary damage in an amount to be determined at the time of trial.

139. As a further direct, proximate, and legal result of the hereinabove alleged delicts of the Defendant, DECEDENTS and each of them were placed in great fear for their own lives and own physical well-being and consciously suffered extreme, severe, and relentless mental and emotional anguish, terror, and physical pain, and continued to suffer such terror, pain, and anguish for a substantial period of time until they died by fire and asphyxiation while trapped in CONCEPTION's chaotic and over-crowded bunk room, all to their Estates' nonpecuniary damage in an amount to be proven at the time of trial herein.

140. As a further direct, proximate, and legal result of the hereinabove alleged delicts of Defendant, DECEDENT CHAN consciously suffered extreme, severe, and relentless fear for his own life and physical well-being, and for the life and physical well-being of his daughter and fellow passenger KENDRA MOORE CHAN and continued to suffer such fear for a substantial period of time until he died by fire and asphyxiation, all to his Estate's nonpecuniary damage in an amount to be proven at the time of trial.

141. As a further direct, proximate, and legal result of the hereinabove alleged delicts of the Defendant, DECEDENT MOORE CHAN consciously suffered

SIAA Complaint of Plaintiffs
for Wrongful Death and Survival Damages

extreme, severe, and relentless fear for her own life and physical well-being, and for the life and physical well-being of her father and fellow passenger RAYMOND SCOTT CHAN and continued to suffer such fear for a substantial period of time until she died by fire and asphyxiation, all to her Estate's nonpecuniary damage in an amount to be proven at the time of trial.

142. As a further direct, proximate, and legal result of the hereinabove alleged delicts of Defendant, DECEDENT DEOPUJARI consciously suffered extreme, severe, and relentless fear for her own life and physical well-being, and for the life and physical well-being of her husband and fellow passenger DECEDENT NIRMAL and continued to suffer such fear for a substantial period of time until she died by fire and asphyxiation, all to her Estate's nonpecuniary damage in an amount to be proven at the time of trial

143. As a further direct, proximate, and legal result of the hereinabove alleged delicts of Defendant, DECEDENT FELIPE consciously suffered extreme, severe, and relentless fear for her own life and physical well-being, and for the life and physical well-being of her travel companions and close friend TIA NICOLE ADAMIC SALIKA, and her parents STEVEN SALIKA and CAROL DIANA ADAMIC. The DECEDENT continued to suffer such fear for a substantial period of time until he died by fire and asphyxiation, all to his Estate's nonpecuniary damage in an amount to be proven at the time of trial

144. As a further, direct, proximate, and legal result of the hereinabove alleged delicts of Defendant, DECEDENTS ADAMIC, SALIKA and ADAMIC SALIKA consciously suffered extreme, severe, and relentless fear for their own lives and physical well-being, the lives and physical well-being of each other, and their travel companion and close friend DECEDENT FELIPE.  The DECEDENTS continued to suffer such fear for a substantial period of time until he died by fire and asphyxiation, all to his Estate's nonpecuniary damage in an amount to be proven at the time of trial

145. As a further direct, proximate, and legal result of the hereinabove alleged

SIAA Complaint of Plaintiffs
for Wrongful Death and Survival Damages

delicts of Defendant, DECEDENT FRITZ consciously suffered extreme, severe, and relentless fear for his own life and physical well-being, and for the life and physical well-being of his wife and fellow passenger ADRIAN DAHOOD-FRITZ and continued to suffer such fear for a substantial period of time until he died by fire and asphyxiation, all to his Estate's nonpecuniary damage in an amount to be proven at the time of trial.

146. As a further direct, proximate, and legal result of the hereinabove alleged delicts of Defendant, DECEDENT NIRMAL consciously suffered extreme, severe, and relentless fear for his own life and physical well-being, and for the life and physical well-being of his wife and fellow passenger DECEDENT DEOPUJARI and continued to suffer such fear for a substantial period of time until he died by fire and asphyxiation, all to his Estate's nonpecuniary damage in an amount to be proven at the time of trial.

147. As a further direct, proximate, and legal result of the hereinabove alleged delicts of Defendant, DECEDENTS EVANMICHAEL QUITASOL, ANGELA QUITASOL, and NICOLE QUITASOL,  and each of them, consciously suffered extreme, severe, and relentless fear for one another's lives and physical well-being. Additionally, DECEDENTS EVANMICHAEL QUITASOL, ANGELA QUITASOL, and NICOLE QUITASOL,  and each of them, consciously suffered extreme, severe, and relentless fear for the loss of life of their biological father, MICHAEL QUITASOL, who also perished in the fire. The DECEDENTS continued to suffer such fear for a substantial period of time until they each died by fire and asphyxiation, all to their Estate's nonpecuniary damage in an amount to be proven at the time of trial.

148. As a further direct, proximate, and legal result of the hereinabove alleged delicts of Defendant, DECEDENT MICHAEL QUITASOL, consciously suffered extreme, severe, and relentless fear for his own life and physical well-being. Additionally, DECEDENT MICHAEL QUITASOL consciously suffered extreme,

severe, and relentless fear for the loss of life of his wife, DECEDENT FERNISA SISON, and his three adult daughters (DECEDENTS EVANMICHAEL QUITASOL, ANGELA QUITASOL, and NICOLE QUITASOL), who also perished in the fire. The DECEDENT continued to suffer such fear for a substantial period of time until he died by fire and asphyxiation, all to his Estate's nonpecuniary damage in an amount to be proven at the time of trial.

149. As a further direct, proximate, and legal result of the hereinabove alleged delicts of Defendant, DECEDENT FERNISA SISON, consciously suffered extreme, severe, and relentless fear for her own life and physical well-being. Additionally, DECEDENT FERNISA SISON consciously suffered extreme, severe, and relentless fear for the loss of life of her husband and fellow passenger, DECEDENT MICHAEL QUITASOL, who also perished in the fire. The DECEDENT continued to suffer such fear for a substantial period of time until she died by fire and asphyxiation, all to her Estate's nonpecuniary damage in an amount to be proven at the time of trial.

150. DECEDENT FERNISA SISON had a statistical life expectancy of another 30 years at the time of her death. As a further direct and proximate result of the hereinabove alleged delicts of the Defendant,  DECEDENT FERNISA SISON has incurred and will continue to incur a loss of future earnings and income, all to her Estate's pecuniary damage in an amount to be determined at the time of trial.

151. DECEDENT MOORE CHAN was not married, had no children, and had a statistical life expectancy of another fifty-four years at the time of her death.  As a further direct and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT MOORE CHAN has incurred and will continue to incur a loss of future earnings and income, all to her Estate's pecuniary damage in an amount to be determined at the time of trial.

152. DECEDENT SCOTT CHAN had a statistical life expectancy of another 44 years at the time of his death. As a further direct and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT SCOTT CHAN has

incurred and will continue to incur a loss of future earnings and income, all to her Estate's pecuniary damage in an amount to be determined at the time of trial.

153. DECEDENT HATANO was not married, had no children, and had a statistical life expectancy of another forty-three years at the time of her death.  As a further direct and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT HATANO has incurred and will continue to incur a loss of future earnings and income, all to her Estate's pecuniary damage in an amount to be determined at the time of trial.

154. DECEDENT SINGH SANDHU was not married, had no children, and had a statistical life expectancy of another thirty-eight years at the time of his death. As a further direct and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT SINGH SANDHU has incurred and will continue to incur a loss of future earnings and income, all to her Estate's pecuniary damage in an amount to be determined at the time of trial.

155. DECEDENT AHOPELTO had a statistical life expectancy of another thirty-four years at the time of his death. As a further direct and proximate result of the hereinabove alleged delicts of the Defendants and each of them, Decedent AHOPELTO has incurred and will continue to incur a loss of future earnings and income, all to his successors-in-interest pecuniary damage in an amount to be determined at the time of trial.

156. DECEDENT FELIPE was not married, had no children, and had a statistical life expectancy of another sixty-five years at the time of her death. As a further direct and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT FELIPE has incurred and will continue to incur a loss of future earnings and income, all to her Estate's pecuniary damage in an amount to be determined at the time of trial.

157. DECEDENT TAN was not married, had no children, and had a statistical life expectancy of another fifty-five years at the time of her death. As a further direct

and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT TAN has incurred and will continue to incur a loss of future earnings and income, all to her Estate's pecuniary damage in an amount to be determined at the time of trial.

158. DECEDENT ADAMIC SALIKA was not married, had no children, and had a statistical life expectancy of another fifty-five years at the time of her death. As a further direct and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT ADAMIC SALIKA has incurred and will continue to incur a loss of future earnings and income, all to her Estate's pecuniary damage in an amount to be determined at the time of trial

159. DECEDENT MICHAEL QUITASOL had a statistical life expectancy of 25 years. As a further direct and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT MICHAEL QUITASOL has incurred and will continue to incur a loss of future earnings and income, all to his Estate's pecuniary damage in an amount to be determined at the time of trial.

160. DECEDENT STEVEN JOHN SALIKA had a statistical life expectancy of 33 years. As a further direct and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT  SALIKA has incurred and will continue to incur a loss of future earnings and income, all to his Estate's pecuniary damage in an amount to be determined at the time of trial.

161. DECEDENT CAROL DIANA ADAMIC had a statistical life expectancy of 28 years. As a further direct and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT CAROL DIANA ADAMIC has incurred and will continue to incur a loss of future earnings and income, all to his Estate's pecuniary damage in an amount to be determined at the time of trial.

162. DECEDENT LIN had a statistical life expectancy of another forty-six years at the time of her death.  As a further direct and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT LIN has incurred and will

continue to incur a loss of future earnings and income, all to her Estate's pecuniary damage in an amount to be determined at the time of trial.

163. DECEDENT DIGNAM had a statistical life expectancy of another twenty-eight years at the time of his death. As a further direct and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT DIGNAM has incurred and will continue to incur a loss of future earnings and income, all to his Estate's pecuniary damage in an amount to be determined at the time of trial.

164. DECEDENT MCILVAIN had a statistical life expectancy of another 44 years at the time of his death. As a further direct and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT MCILVAIN has incurred and will continue to incur a loss of future earnings and income, all to his Estate's pecuniary damage in an amount to be determined at the time of trial.

165. DECEDENT GUINEY had a had a statistical life expectancy of another 37 years at the time of her death. As a further direct and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT GUINEY has incurred and will continue to incur a loss of future earnings and income, all to her Estate's pecuniary damage in an amount to be determined at the time of trial.

166. DECEDENT EVANMICHAEL SOLANO QUITASOL was not married, had no children, and had a statistical life expectancy of another 46 years at the time of her death. As a further direct and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT has incurred and will continue to incur a loss of future earnings and income, all to her Estate's pecuniary damage in an amount to be determined at the time of trial.

167. DECEDENT ANGELA ROSE SOLANO QUITASOL was not married, had no children, and had a statistical life expectancy of another 54.5 years at the time of her death. As a further direct and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT has incurred and will continue to incur a loss of future earnings and income, all to her Estate's pecuniary damage in an amount to be

1 determined at the time of trial.

2     168. DECEDENT NICOLE SOLANO QUITASOL was not married, had no

3 children, and had a statistical life expectancy of another 51.6 years at the time of her

4 death. As a further direct and proximate result of the hereinabove alleged delicts of

5 the Defendant, DECEDENT has incurred and will continue to incur a loss of future

6 earnings and income, all to her Estate's pecuniary damage in an amount to be

7 determined at the time of trial.

8     169. DECEDENT KURTZ was not married, had no children, and had a

9 statistical life expectancy of another 62 years at the time of her death. As a further

10 direct and proximate result of the hereinabove alleged delicts of the Defendant,

11 DECEDENT KURTZ has incurred and will continue to incur a loss of future earnings

12 and income, all to her Estate's pecuniary damage in an amount to be determined at the

13 time of trial.

14     170. DECEDENT TAKVAM had a statistical life expectancy of another 44.1

15 years at the time of his death.  As a further direct and proximate result of the

16 hereinabove alleged delicts of the Defendant, DECEDENT TAKVAM has incurred

17 and will continue to incur a loss of future earnings and income, all to his Estate's

18 pecuniary damage in an amount to be determined at the time of trial.

19     171. DECEDENT GARCIA had a statistical life expectancy of another 42 years

20 at the time of his death. As a further direct and proximate result of the hereinabove

21 alleged delicts of the Defendant, DECEDENT GARCIA has incurred and will

22 continue to incur a loss of future earnings and income, all to his Estate's pecuniary

23 damage in an amount to be determined at the time of trial.

24     172. DECEDENT KRASHENNAYA had a statistical life expectancy of

25 another 48 years at the time of her death. As a further direct and proximate result of

26 the hereinabove alleged delicts of the Defendant, DECEDENT KRASHENNAYA

27 has incurred and will continue to incur a loss of future earnings and income, all to her

28 Estate's pecuniary damage in an amount to be determined at the time of trial.

173. As a further direct and proximate result of the hereinabove alleged delicts of the Defendants and each of them, DECEDENT DEOPUJARI has incurred and will continue to incur a loss of future earnings and income, all to his Estate' pecuniary damage in an amount to be determined at the time of trial.

174. DECEDENT WILLIAMS had a statistical life expectancy of another 46 years at the time of her death. As a further direct and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT WILLIAMS has incurred and will continue to incur a loss of future earnings and income, all to her Estate's pecuniary damage in an amount to be determined at the time of trial.

175. DECEDENT FIEDLER had a statistical life expectancy of another 36 years at the time of her death. As a further direct and proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT FIEDLER has incurred and will continue to incur a loss of future earnings and income, all to her Estate's pecuniary damage in an amount to be determined at the time of trial.

### THIRD CAUSE OF ACTION
(For Personal Injuries for Plaintiff SIMS)

176. Plaintiff SIMS herewith refers to and by that reference incorporates paragraphs 1 - 129, as though fully set forth herein, each and every allegation set forth in Paragraphs  through  hereinabove.

177. As a direct and proximate result of the hereinabove alleged delicts of Defendant, Plaintiff SIMS incurred and shall continue to incur medical expenses, all to his special damage in an amount to be determined at the time of trial herein.

178. As a further direct and proximate result of the hereinabove alleged delicts of Defendant, Plaintiff SIMS has suffered and will continue to suffer a loss of wages, benefits, and earning capacity, all to his further special damage in an amount to be determined at the time of trial herein.

179. As a further direct and proximate result of the hereinabove alleged delicts of Defendant, Plaintiff SIMS injured various parts of his body, including but not

limited to a broken leg, and has experience and will continue to experience severe and permanent mental, physical, nervous, and emotional pain, suffering, and distress all to his general damage in an amount to be determined at the time of trial.

180. WHEREFORE Plaintiffs pray judgment against Defendant the UNITED STATES OF AMERICA as follows:

181. Funeral expenses in accordance with the allegations set forth above;

182. Pecuniary and nonpecuniary survival damages, including DECEDENTS' pre-death pain and suffering, in accordance with the allegations set forth above;

183. Pecuniary and nonpecuniary wrongful death damages, in accordance with the allegations set forth above;

184. For Plaintiff SIMS' general and special personal injury damages;

185. For prejudgment interest;

186. For the costs of suit herein; and,

187. For such other and further relief as the Court may deem just and proper.

DATED: September 1, 2021.

MCGUINN HILLSMAN AND PALEFSKY

*/s/John R. Hillsman*
JOHN R. HILLSMAN
535 Pacific Avenue Suite 100
San Francisco, CA 94133
415-421-9292
Email: jrhillsman@mhpsf.com

Counsel for: Victoria Ellen Moore, Christine Dignam, Jasmine Lord, Yuka Hatashi Merritt, and Viikram Singh.

NELSON & FRAENKEL, LLP

*/s/Carlos F. Llinás Negret*
Gretchen M. Nelson
Carlos F. Llinás Negret
601 South Figueroa Street, Suite 2050
Los Angeles, CA 90017
844-622-6469
cllinas@nflawfirm.com

Counsel for: Cheng Leng Tan, Estate of Wei Tan, Chik Ping Yap, Sejay Tan, Yadira Alvarez, Estate of Berenice Felipe, Nina Huttegger, Julia Ahopelto, C.A. (a minor), Jean Anne Allen, Estate of Carol Diana Adamic, Estate of Steven John Salika, Estate of Tia Nicole Adamic Salika, Shirley Salika, James Adamic.

SALTZ MONGELUZZI AND BENDESKY PC

*/s/ Jeffrey P. Goodman*
Jeffrey P Goodman (Pro Hac Vice To Be Submitted)
Ernest D. DiSandro, Jr. (Pro Hac Vice To Be Submitted
1650 Market Street 52nd Floor
Philadelphia, PA 19103
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
jgoodman@smbb.com

PANISH SHEA AND BOYLE LLP

*/s/Robert Samuel Glassman*
Robert Samuel Glassman
11111 Santa Monica Boulevard Suite 700
Los Angeles, CA 90025
310-477-1700
glassman@psblaw.com

Counsel for: Mathew Guiney, Shruti Deopuraji, Robert Kurtz, Cherie McDonough, Kaustubh Nirmal, Gregory Krashenny, Seema Sharma, Cherie McDonough, Anthony Beitzinger, Henry Garcia, Margaret Strom, Eric Baltz, Atlee Fritz.

GALINE FRYE FITTING AND FRANGOS

*/s/Ilya Demetrios Frangos*
ILYA DEMETRIOS FRANGOS
411 Borel Avenue Suite 500
San Mateo, CA 94402
650-345-8484
ifrangos@gff-law.com

Counsel for: Richard X. Liu, Estate of Xiang Lin.

SCHUERING ZIMMERMAN AND DOYLE LLP

*/s/Theodore Derk Poppinga*
Theodore Derk Poppinga
Robert Harry Zimmerman
400 University Avenue
Sacramento, CA 95825
916-567-0400
tdp@szs.com

Counsel for: Susana Solano Rosas.

FIORE ACHERMANN ALC

*/s/Jennifer L Fiore*
Jennifer L Fiore
Sophia M Acherman
340 Pine Street Suite 503
San Francisco, CA 94104
415-550-0650
jennifer@thefafirm.com

Counsel for: Ariel Takvam, Kenneth Takvam, Mary R. Takvam, Mark Adamic, Angelika Adamic.

WALKUP MELODIA KELLY WECHT AND SCHOENBERGER

*/s/Matthew D Davis*
Matthew D Davis
650 California Street, 26th Floor
San Francisco, CA 94108
415-981-7210
dsaeltzer@walkuplawoffice.com

Counsel for: Christina Quitasol, Katie Osborne, Olga Faynshteyn, Sarma Williams, Nancy Fiedler, Mathew Guiney.

LAW OFFICE OF W RUSSELL FIELDS

*/s/Aurelio Edward Fields*
Aurelio Edward Fields
1792 Tribute Road Suite 400
Sacramento, CA 95815
916-646-6100
ed@russfieldslaw.com

Counsel for: Dominic Micael Selga, Estate of Fernisa June Sison, Nisa Shinagawa.

ARNOLD AND ITKIN LLP

*/s/Cory Itkin*
Cory Itkin
Roland T Christensen
6009 Memorial Drive
Houston, TX 77007
713-222-3800
citkin@arnolditkin.com

Counsel for: Ryan Sims.

*/s/ Todd M. Abbott*
Todd M. Abbott, Esquire
2127 Olympic Parkway, Suite 1006, Number 348
Chula Vista, California 91915
tmabbottlaw@gmail.com

Counsel for: Daniel Poh-Hock Chua; Estate of Kristen Findstad.