1   GRETCHEN NELSON, ESQ. (S.B.N. 112566)
    (gnelson@nflawfirm.com)
2   CARLOS LLINAS NEGRET, ESQ. (S.B.N. 284746)
    (cllinas@nflawfirm.com)
3   NELSON & FRAENKEL LLP
    601 South Figueroa Street, Suite 2050
4   Los Angeles, CA 90017
5   Telephone: (213) 622-6469

6   JOHN R. HILLSMAN (S.B.N. 71220)
7   (jrhillsman@mhpsf.com)
    MCGUINN, HILLSMAN & PALEFSKY
8   535 Pacific Avenue
    San Francisco, CA 94 I 33
9   Telephone: ( 415) 421-9292

10
    DOUGLAS DISANDRO, JR., ESQ.  (admitted pro hac vice)
11  (ddisandro@smbb.com)
12  SALTZ MONGELUZZI & BENDESKY P.C.
    1650 Market Street
13  Philadelphia, PA 19103
    Telephone: (2I5) 496-8282
14

15  *Counsel for Plaintiffs (Additional Plaintiffs' counsel identified on signature page)*

16              UNITED STATES DISTRICT COURT

17      CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

18  NANCY FIEDLER, et al.,                Case No. 2:21-cv-07065-PA-MRW

19                 Plaintiffs,            Honorable Percy Anderson
                                          Courtroom 9A
20
    vs.                                   **PLAINTIFFS' MEMORANDUM
21                                        OF POINTS AND AUTHORITIES
                                          IN OPPOSITION TO UNITED
22  UNITED STATES OF AMERICA, et al.,     STATES' MOTION TO DISMISS
                                          PLAINTIFFS' FIRST AMENDED
23                 Defendant.             COMPLAINT FOR LACK OF
                                          SUBJECT MATTER
24                                        JURISDICTION
                                          [Fed.R.Civ.P.12(b)(1)]**
25
                                           Hearing Date: Not Set
26

27

28

    _____
    conception oppo. 2024.07.08 final

# <u>TABLE OF CONTENTS</u>

I.   SUMMARY OF PLAINTIFFS' OPPOSITION ................................................ 1

II.   THE GOVERNMENT'S MOTION ................................................ 4

III.   THE APPLICABLE LEGAL STANDARDS ................................................ 5

IV.  THE DISPUTED MATERIAL FACTS ................................................ 9

V.  ARGUMENT ................................................ 9

   1.  THE GOVERNMENT'S MOTION MAY BE DENIED ON PROCEDURAL GROUNDS ALONE ................................................ 14

      A. THE GOVERNMENT DID NOT COMPLY WITH LOCAL RULE 56.1 ................................................ 14

      B. THE COURT SHOULD ALSO DENY THE MOTION UNDER FED. R. CIV. P 56(d), BECAUSE PLAINTIFFS HAVE NOT BEEN AFFORDED FULL ACCESS TO EVIDENCE AND THUS HAVE BEEN HAMPERED IN THEIR ABILITY TO OFFER ALL EVIDENCE ESSENTIAL TO THEIR OPPOSITION ................................................ 15

   2.  THE GOVERNMET'S MOTION SHOULD ALSO BE DENIED ON SUBSTANTIVE GROUDS ................................................ 14

      A. AS THE PARTY SEEKING SUMMARY DISMISSAL, THE GOVERNMENT MUST "SATISFY A DEMANDING STANDARD" ................................................ 17

      B. THE GOVERNMENT DID NOT AND CANNOT SATIFY THAT DEMANDING STANDARD ................................................ 18

         i. TO OBTAIN SUMMARY JUDGMENT IN ITS FAVIR UNDER THE DISCRETIONARY FUNCTION DEFENSE, THE GOVERNMENT MUST ESTABLISH, AS A MATTER OF LAW, BOTH THAT THE OFFICIAL CONDUCT IT IS TRYING TO SHIELD WAS DISCRETIONARY AND THAT IT INVOLVED A SOCIAL, ECONOMIC, OR POLITICAL DECISION ................................................ 18

         ii. THE GOVERNMENT DID NOT AND CANNOT ESTABLISH AS A MATTER OF LAW THAT THE CONDUCT IT IS TRYING TO SHIELD WAS INDEED DISCRETIONARY ................................................ 20

            a. WHILE THE DESIGN OF A COURSE OF GOVERNMENTAL ACTION MAY BE A POLICY CHOICE SHIELDED BY THE DISCRETIONARY FUNCTION EXCEPTION, THE FAILURE TO FOLLOW POLICY CHOICES ALREADY MADE IS NOT .. 20

            b. THE OCMIS FROM MSD SANTA BARBARA FAILED TO FOLLOW POLICY CHOICES ALREADY MADE WHEN THEY VIOLATED THE MANDATORY DUTIES SPELLED OUT IN THE T-REGS ................................................ 21

iii.  NOR CAN THE GOVERNMENT ESTABLISH, AS A MATTER OF LAW, THAT THE MISJUDGMENTS ITS OCMIs MADE WERE BASED ON SOCIAL, ECONOMIC, OR POLITICAL POLICY ..... 23

C. THE GOVERNMENT'S COUNTERARGUMENTS ARE UNAVAILING ................................................................................... 24

i.  THE DISTINCTION THE GOVERNMENT HOPES TO DRAW BETWEEN THE 'OLD T REGS" AND THE "NEW T REGS" DOES NOT PROVIDE IT ANY REFUGE ..................................................... 24

ii. THE AUTHORITIES ON WHICH THE GOVERNMENT RELIES ARE INAPPOSITE ................................................................... 25

iii. THE GOVERNMENT SHOULD NOT BE HEARD TO ARGUE THAT PLAINTIFFS' COMPLAINT DOES NOT SPECIFY ALL THEIR THEORIES OF RECOVERY ................................................... 26

VI.  CONCLUSION ................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albino v. Baca,*
  747 F.3d 1162 (9th Cir. 2014) ................................................................. 18

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) .................................................................. 12, 17

*Anzai v. Chevron Corp.,*
  158 F.Supp.2d 1180 (D. Haw. 2001) ......................................................... 5

*Arbaugh v. Y & H Corp.,*
  546 U.S. 500 (2006) ........................................................................ 27

*Autery v. United States,*
  424 F.3d 944 (9th Cir.2005) ................................................................. 8

*Autery v. United States,*
  992 F.2d 1523 (11th Cir. 1993) ............................................................. 25

*Ayala v. United States,*
  980 F.2d 1342 (10th Cir. 1992) ............................................................. 20

*Baker v. United States,*
  817 F.2d 560 (9th Cir. 1987) ............................................................... 21

*Barnson v. United States,*
  630 F.Supp. 418 (D. Utah 1985) ............................................................ 21

*Bear Medicine v. United States,*
  241 F.3d 1208 (9th Cir. 2001) ......................................................... passim

*Beck-Wilson v. Principi,*
  441 F.3d 353 (6th Cir. 2006) ............................................................... 17

*Berkovitz v. United States,*
  486 U.S. 531 (1988) ............................................................. 2, 19, 21, 24

*Camozzi v. Roland/Miller and Hope Consulting Group,*
  866 F.2d 287 (9th Cir. 1989) ............................................................ 2, 21

*Cassens v. St. Louis River Cruise Lines, Inc.,*
  44 F.3d 508 (7th Cir. 1995) ................................................................ 25

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) .................................................................... 15, 17

*Chance, Inc. v. United States,*
  506 F.Supp.2d. 1196 ..................................................................... 6, 8

iii

*Cline v. Dart Transit Co.,*
   2023 U.S. App. LEXIS 9521 (6th Cir. 2023) ............................................................ 18

*Cohen v. United States,*
   151 F.3d 1338 (11th Cir.1998) ................................................................................. 4

*Coleman v. Quaker Oats Co.,*
   232 F.3d 1271 (9th Cir. 2000) ................................................................................. 26

*Collins v. United States,*
   783 F.2d 1225 (5th Cir. 1986) ................................................................................. 21

*Compagnie Maritime Marfret v. San Juan Bay Pilots Corp.,*
   532 F.Supp.2d 369 (D.P.R. 2008) ................................................................. 6, 8, 9, 28

*Da Silva v. Kinsho Int'l Corp.,*
   229 F.3d 358 (2d Cir. 2000) ................................................................................... 27

*Dalehite v. United States,*
   346 U.S. 15 (1953) ........................................................................................... 19, 26

*Earles v. United States,*
   935 F.2d 1028 (9th Cir. 1991) ........................................................................ 2, 18, 19

*Foster Logging, Inc. v. United States,*
   973 F.3d 1152 (11th Cir. 2020) ............................................................................... 25

*Garcia v. Copenhaver, Bell & Assocs.,*
   104 F.3d 1256 (11th Cir.1997) ................................................................................. 8

*Gatx/Airlog Co. v. United States,*
   286 F.3d 1168 (9th Cir. 2002) ................................................................................. 6

*Gordon v. Lykes Bros. S.S. Co.,*
   835 F.2d 96 (5th Cir. 1988) ...................................................................................... 1

*Griffin v. United States,*
   500 F.2d 1059 (3d Cir. 1974) .................................................................................. 21

*Holloway v. Pagan River Dockside Seafood,*
   669 F.3d 448 (4th Cir. 2012) .............................................................................. 27, 28

*In re Airport Car Rental Antitrust Litigation,*
   474 F.Supp. 1072 .................................................................................................... 5

*Jerome B. Grubart v. Great Lakes Dredge & Dock Co.,*
   513 U.S. 527 (1995) ................................................................................................. 7

*Jones v. Community Redevelopment Agency,*
   733 F.2d 646 (9th Cir.1984) ................................................................................... 26

*Kennewick Irrigation Dist. v. United States,*
   880 F.2d 1018 (9th Cir. 1989) ................................................................................ 16

*Kielwien v. United States,*
   540 F.2d 676 (4th Cir. 1976) .................................................................................. 20

iv

*Laface v. Eastern Suffolk BOCES*,
   349 F. Supp. 3d 126 (E.D. N.Y, 2018) ........................................................ 26

*Lam v. United States*,
   979 F.2d 665 (9th Cir. 2020) ........................................................ 25

*Leite v. Crane Co.*,
   749 F.3d 1117 (9th Cir. 2014) ........................................................ 5

*Markes v. United States*,
   704 F. Supp. 337 (N.D. N.Y. 1988) ........................................................ 21

*Medoil Corp. v. Clark*,
   753 F. Supp. 592 (W.D. N.C. 1990) ........................................................ 27

*Mid-South Holding Co. v. United States*,
   225 F.3d 1201 (11th Cir. 2000) ........................................................ 4

*Morrison v. Amway Corp.*,
   323 F.3d 920 (11th Cir. 2003) ........................................................ 8

*Nelson v. United States*,
   2005 U.S. Dist. LEXIS 45661 (S.D. Ala. 2005) ........................................................ 6

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
   210 F.3d 1099 (9th Cir. 2000) ........................................................ 18

*Olson v. United States*,
   306 Fed. Appx. 360 (9th Cir. 2008) ........................................................ 6

*O'Toole v. United States*,
   295 F.3d 1029 (9th Cir. 2002) ........................................................ 2, 19, 20

*Prescott v. United States*,
   973 F.2d 696 (9th Cir. 1992) ........................................................ 19

*Program Engineering, Inc. v. Triangle Publications, Inc.*,
   634 F.2d 1188 (9th Cir. 1980) ........................................................ 15

*Rodriguez v. Countrywide Homes*,
   668 F. Supp. 2d 1239 (E.D. Cal. 2009) ........................................................ 26

*Rosales v. United States*,
   824 F.2d 799 (9th Cir. 1987) ........................................................ 6, 16

*Sanko S.S. Co. v. United States*,
   2002 U.S. Dist. LEXIS 14936 (E. D. Cal. 2002) ........................................................ 6

*Snyder v. Kohl's Dep't Stores, Inc.*,
   580 F. App'x 458 (6th Cir. 2014) ........................................................ 17

*Soldano v. United States*,
   453 F.3d 1140 (9th Cir. 2006) ........................................................ 20

*Speedeon Data, LLC v. Integrated Direct Mktg., LLC*,
   718 F. App'x 333 (6th Cir. 2017) ........................................................ 17

v

*Steel Co.*,
    523 U.S. ................................................................................................ 27

*Sun Valley Gasoline, Inc. v. Ernst Enterprises, Inc.*,
    ("Sun Valley"), 711 F.2d 138 (9th Cir. 1983) ...................................... 6, 7

*Thornhill Pub. Co. v. General Tel. & Electronics Corp.*,
    594 F.2d 730 (9th Cir. 1979) ............................................................... 5

*Timberlane Lumber Co. v. Bank of America*,
    549 F.2d 597 (9th Cir. 1976) ............................................................. 6, 7

*Torres-Negron v. J & N Records, LLC*,
    504 F.3d 151 (1st Cir.2007) ............................................................... 6, 8

*Trautman v. Buck Steber, Inc.*,
    693 F.2d 440 (5th Cir. 1982) ................................................................ 7

*U.S. ex rel. Fisher v. Network Software Associates*,
    227 F.R.D. 4 (D. D.C. 2005) ............................................................... 15

*United States ex rel. Touhy v. Ragen*,
    340 U.S. 462 (1951) ........................................................................... 16

*United States v. Gaubert*,
    499 U.S. 315 (1991) ............................................................... 19, 21, 24

*United States v. S. A. Empresa De Viacao Aerea Rio Grandense*,
    467 U.S. 797 (1984) ............................................................ 2, 19, 25, 26

*United States v. Webb*,
    655 F.2d 977 (9th Cir. 1981) ............................................................. 27

*Vought v. Brighton*,
    2024 U.S. Dist. LEXIS 59006 (M.D. Penn. 2024) ............................... 15

*Wabun-Ini v. Sessions*,
    900 F.2d 1234 (8th Cir. 1990) ........................................................... 17

*Whisnant v. United States*,
    ("Whisnant"), 400 F.3d 1177 (9th Cir. 2005) ............................... passim

*Wiggins v. United States, through Dep't of Army*,
    799 F.2d 962 (5th Cir. 1986) ............................................................... 1

**Statutes**

18 U.S.C. § 1115 .................................................................................... 1

18 U.S.C. § 1118 .................................................................................. 10

28 U.S.C. § 2680(a) ............................................................ 2, 18, 19, 25

46 U.S.C. § 2101(47) ............................................................................ 10

46 U.S.C. § 30903(a) .............................................................................. 2

46 U.S.C. §§ 30901-30916 ................................................................................ 1

49 U.S.C. § 1421(a)(1) ..................................................................................... 25

## Rules

Fed. R. Civ. P. 8 ............................................................................................... 26

Fed. R. Civ. P. 30(b)(6) ..................................................................................... 2

FED. R. CIV. P. 56(d) ................................................................................ 15, 17

Fed. R. Civ. P. 56(d)(1) ................................................................................. 15

Fed. R. Civ. P. Rule 15(a)(2) ......................................................................... 26

Fed.R.Civ.P.12(b)(1) ............................................................................. passim

Rule 12(b)(6) ..................................................................................................... 5

Rule 15 ............................................................................................................. 27

Rule 15(a) ........................................................................................................ 27

## Regulations

45 C.F.R. § 177.405(f) .................................................................................... 10

46 C.F.R. 176.100(a) ..................................................................................... 11

46 C.F.R. Parts 175-186 ................................................................................... 1

46 C.F.R. § 175.110(a) ................................................................................... 10

46 C.F.R. § 176.500(b) ................................................................................... 11

46 C.F.R. § 176.500(b)(1)(ii) ......................................................................... 11

46 C.F.R. § 176.500(b)(1)(iii) ........................................................................ 11

46 C.F.R. § 176.500(d)(ii) ........................................................................ 23, 26

46 C.F.R. § 176.600(c) ................................................................................... 11

46 C.F.R. § 176.806(a) .............................................................................. 12, 13

46 C.F.R. § 176.830(a) ............................................................................. passim

46 C.F.R. § 177.115(b) ................................................................................... 24

46 C.F.R. § 183.200 .......................................................................................... 4

46 C.F.R. § 183.340(b)(1) ......................................................................... 12, 13

46 C.F.R. § 183.340(d)(2) ......................................................................... 12, 13

46 C.F.R. §§ 175.112 and 183.115(b) ........................................................... 24

46 C.F.R. §§ 176.500 and 176.806 ................................................................ 4

46 CFR § 175.806(a) ...................................................................................... 23

46 CFR, Chapter I, Subchapter T .................................................................. 10

C.F.R.s, §§ 176.500(d)(ii), 175.806(a), and 176.830(a) ................................ 23

Plaintiffs respectfully submit this Memorandum of Points and Authorities in opposition to the Motion to Dismiss the United States of America ("Defendant" or the "Government") filed under Fed. R. Civ. P. 12(b)(1).  In addition, Plaintiffs are filing concurrently herewith a Separate Statement of Disputed Material Facts and the Declaration of John R. Hillsman which attaches the various exhibits on which Plaintiffs rely.

## I.    SUMMARY OF PLAINTIFFS' OPPOSITION

When the dive boat *Conception* erupted in flames during the early morning hours of September 2, 2019 -- catching her captain and crew off guard and sound asleep -- she burned to the waterline killing 34 people. When the United States prosecuted *Conception's* master, Jerry Boylan, for "seaman's manslaughter" under 18 U.S.C. § 1115 – charging, *inter alia,* that he had failed to maintain a 24-hour roving watch on the night of the fire -- the Government insisted that the blaze had originated in a plastic trash can located on the vessel's weather deck just aft of the salon. But when the families of *Conception's* victims ("the *Conception* families") sued the Government under the Suits in Admiralty Act ("SIAA"), 46 U.S.C. §§ 30901-30916 – charging, *inter alia,* that Coast Guard inspectors ("OCMI's") had repeatedly and improperly certified *Conception* for overnight operation as a "small passenger vessel" under Subchapter T of the Coast Guard Regulations (the so-called "T Regs"), 46 C.F.R. Parts 175-186, while her galley, salon, and weather decks were outfitted with such obvious fire hazards as plastic trash cans, plastic garden chairs, and non-marine wiring -- the Government invoked "the discretionary function exception" and moved to dismiss their action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.

"The discretionary function exception is based on a 'combination of the doctrines of sovereign immunity and separation of powers.'"[1] Although the SIAA

---

[1]    *Gordon v. Lykes Bros. S.S. Co.*, 835 F.2d 96, 99 (5th Cir. 1988) (quoting *Wiggins v. United States, through Dep't of Army*, 799 F.2d 962, 965 (5th Cir. 1986)), cert. denied, 488 U.S. 825, 109 S. Ct. 73 (1988).

explicitly waives sovereign immunity in cases where a proceeding in admiralty could be maintained *in personam* against a private defendant, 46 U.S.C. § 30903(a), that waiver has been held to incorporate the discretionary-function exception spelled out in the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a).[2] Congress enacted that exception to fortify its powers under Article I and "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."[3] But the discretionary function exception "should be read narrowly."[4] Not all Governmental decisions or omissions comprise social, economic, or political judgments, and "'a failure to effectuate policy choices already made' will not be protected[.]"[5] "The decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not."[6] It follows that: "When a suit charges an agency with failing to act in accord with a specific mandatory directive, the discretionary function exception does not apply."[7] This suit charges the Coast Guard with just such a failure.

According to 46 C.F.R. § 176.830(a): "At each inspection for certification and at every other vessel inspection all observed unsafe practices, fire hazards, and other hazardous situations must be corrected, and all required guards and protective devices must be in satisfactory condition." The Government designated Cmdr. Stephanie Hodgdon, the contemporary Chief of the Coast Guard's Commercial Vessel Compliance Division, as its PMQ under Fed. R. Civ. P. 30(b)(6) with respect to "the

---

[2]    *Earles v. United States*, 935 F.2d 1028, 1031 (9th Cir. 1991).
[3]    *United States v. S. A. Empresa De Viacao Aerea Rio Grandense*, 467 U.S. 797, 814 (1984).
[4]    *O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002).
[5]    *Bear Medicine v. United States,* 241 F.3d 1208, 1215 (9th Cir. 2001) (quoting *Camozzi v. Roland/Miller and Hope Consulting Group*, 866 F.2d 287, 290 (9th Cir. 1989)).
[6]    *Bear Medicine*, 241 F.3d at 1215.
[7]    *Berkovitz v. United States*, 486 U.S. 531, 544 (1988).

day-to-day application of Subchapter T."[8] Cmdr. Hodgdon is also a fully qualified OCMI.[9] When asked about § 176.830(a) at her deposition in this case, she testified:

> Q. Can we agree that this is a directive?
>
> A. Yes.
>
> Q. It's a mandate?
>
> A. Yes.
>
> Q. And to restate that mandate in terms material to the instant question, can we agree that at each inspection for certification and at every other vessel inspection, all observed fire hazards must be corrected?
>
> A. Yes.
>
> Q. Okay. Now, just generally speaking, and drawing on your own personal experience, what are we talking about when we use the phrase 'fire hazards'?
>
> A. There is a broad range of what fire hazards could be.
>
> Q That's why I'm asking you to describe it.
>
> A. So, the easiest one would be a non-steel trash can."[10]

When we showed Cmdr. Hodgdon a video frame of the plastic trash Government prosecutors in Capt.Boylan's criminal case identified as the source of the fire and asked the Cmdr. "to assume that you boarded *Conception*, that you saw that polypropylene receptacle on the afterdeck, that you saw it situated directly beneath a wooden stairway and wooden shelves directly aft of a wooden bulkhead in the position that's depicted in this video still," she answered as follows:

> Q. My question to you is -- do you recognize that as an obvious fire hazard within the meaning of the regs?"
>
> A. Yes.

---

[8] Hillsman Decl., *Exhibit 6* at 29:20-30:23; Material Statement of Facts (hereinafter, "MSF") 14.

[9] *Id.* at 30:24-32:14; MSF 14.

[10] *Id*. at 230:7-24; MSF 14.

1       Q. Okay.  Now, given that hypothetical, can we agree that a marine inspector
2           had a mandatory duty to list that deficiency, to log it, and to ensure that it
3           had been rectified?

4       A. Per policy, yes.[11]

5 An OCMI could not inspect or even visit *Conception's* after deck, sun deck, salon,

6 galley, or passenger accommodations without seeing those trash cans and plastic chairs.

7 (MSF 17-20, 24-26.)

8       What is more, according to 46 C.F.R. § 176.830(a), all of *Conception's* "required

9 guards and protective devices must be in satisfactory condition" at "each inspection for

10 certification and at every other vessel inspection." Post-accident inspections revealed

11 an old and obviously unsatisfactory hole in the fire main that delivered high-pressure

12 water from *Conception's* fire pump to her fire hoses. (MSF 60-69.) Finally, the Coast

13 Guard's own inspection records show that the OCMI who last inspected *Conception*

14 cleared her to sail even though he knew or should have known that her 24-volt system

15 was equipped with substandard wiring in violation of 46 C.F.R. §§ 176.500 and

16 176.806. (MSF 27-59.) Such wiring is another obvious fire hazard. 46 C.F.R. §

17 183.200. The *Conception* was freighted with such hazards on February 13, 2019, when

18 the Coast Guard's Marine Safety Detachment ("MSD") in Santa Barbara certified her

19 as fit for coastwise service as a small passenger vessel.

20       The Government's Motion does not mention any of those obvious fire hazards

21 much less prove, as a matter of law, that their fatal presence aboard *Conception* can be

22 excused by social, economic, or political considerations.

23             **II.**    **THE GOVERNMENT'S MOTION**

24       Where applicable, the discretionary function exception abrogates federal subject

25 matter jurisdiction. See e.g. *Mid-South Holding Co. v. United States*, 225 F.3d 1201,

26 1203-1204 (11th Cir. 2000); *Cohen v. United States*, 151 F.3d 1338, 1340 (11th

27 Cir.1998). That is why the Government seeks relief under Fed. R. Civ. P. 12(b)(1). The

28 _____
[11] *Id.* at 235:24-236: 3; MSF 16.

Government does not ask for an interlocutory legal ruling under Rule 16(c), see e.g. *In re Airport Car Rental Antitrust Litigation*, 474 F.Supp. 1072, 1109, n. 41 (N.D. Cal. 1979), or partial summary judgment under Rule 56(a). See e.g. *Anzai v. Chevron Corp.*, 158 F.Supp.2d 1180, 1183 (D. Haw. 2001). Rather, it requests "an Order dismissing Plaintiffs' entire First Amended Complaint (ECF 49) on the ground that the Court lacks subject matter jurisdiction over this action."  ECF 88 at 4:3-5.

Rule 12(b)(1) allows a defendant to challenge subject matter jurisdiction with either a "facial attack" or a "factual attack." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (compiling cases). A facial attack "accepts the truth of the plaintiff's allegations" and is decided like "a motion to dismiss under Rule 12(b)(6)", while a factual attack "contests the truth of the plaintiff's factual allegations" with "evidence outside the pleadings" and is decided "under the same evidentiary standard that governs in the summary judgment context" under Rule 56.  *Leite*, 749 F.3d at 1121.

The Government brings a factual attack.

### III.    THE APPLICABLE LEGAL STANDARDS

A motion to dismiss for lack of subject matter jurisdiction may be made as a 'speaking motion' attacking the existence of subject matter jurisdiction in fact. Where the jurisdictional issue is separable from the merits of the case, the judge may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary. [] No presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.

*Thornhill Pub. Co. v. General Tel. & Electronics Corp.*, 594 F.2d 730, 733 (9th Cir. 1979) (citations omitted). But the rule is otherwise where the Government brings a speaking motion under Rule 12(b)(1) based on the discretionary function exception.

*Olson v. United States,* 306 Fed. Appx. 360, 362 (9th Cir. 2008). Such motions should be "treated as a motion for summary judgment", *id.,* and granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Torres-Negron v. J & N Records, LLC*, 504 F.3d 151, 162 (1st Cir.2007): see also *Compagnie Maritime Marfret v. San Juan Bay Pilots Corp.*, 532 F.Supp.2d 369, 373 (D.P.R. 2008); *Capt. Chance, Inc. v. United States,* 506 F.Supp.2d. 1196, 1200, n. 3 (M. D. Fla 2007); *Nelson v. United States*, 2005 U.S. Dist. LEXIS 45661, **4-5 (S.D. Ala. 2005); *Sanko S.S. Co. v. United States*, 2002 U.S. Dist. LEXIS 14936, **11-14 (E. D. Cal. 2002). There are several reasons for that.

First, while the burden of establishing jurisdiction ordinarily rests on the plaintiff, "[t]he burden of proving the applicability of the discretionary function exception is on the United States." *Bear Medicine v. United States*, 241 F.3d 1208, 1213 (9th Cir. 2001); see also *Gatx/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002) ("Whether a challenged action falls within the discretionary function exception requires a particularized analysis of the specific agency action challenged. The government bears the burden of proving that the discretionary function exception applies.") (citations omitted); *Whisnant v. United States ("Whisnant"),* 400 F.3d 1177, 1181 (9th Cir. 2005) ("It is the government's burden to demonstrate the applicability of the discretionary function.").

What is more, "a jurisdictional finding of genuinely disputed facts is inappropriate whenever 'the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits' of an action.'" *Sun Valley Gasoline, Inc. v. Ernst Enterprises, Inc*. ("*Sun Valley*"), 711 F.2d 138, 139 (9th Cir. 1983) (quoting *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597, 602 (9th Cir. 1976)); see also *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1987) ("If the jurisdictional issue and substantive claims are so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits, the district court should

employ the standard applicable to a motion for summary judgment and grant the motion to dismiss for lack of jurisdiction **only** if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law" (emphasis added)). As the Supreme Court explained in *Jerome B. Grubart v. Great Lakes Dredge & Dock Co*., 513 U.S. 527 (1995), the assumption "that the truth of jurisdictional allegations must always be determined with finality at the threshold of litigation" under Rule 12(b)(1) "is erroneous." *Id.* at 537. Ordinary "practice permits a party to establish jurisdiction at the outset of a case by means of a nonfrivolous assertion of jurisdictional elements, and any litigation of a contested subject-matter jurisdictional fact issue occurs in comparatively summary procedure before a judge alone (as distinct from litigation of the same fact issue as an element of the cause of action, if the claim survives the jurisdictional objection)." *Id.* at 537-538 (citations omitted).

"Normally, the question of jurisdiction and the merits of an action will be considered intertwined where, as here, 'a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief.'" *Sun Valley*, 711 F.2d at 139-140 (quoting *Timberlane*, 549 F.2d at 602). The SIAA provides both the substantive basis for the *Conception* families' claims **and** the "jurisdictional hook" on which those claims hang. See *Trautman v. Buck Steber, Inc.*, 693 F.2d 440, 443 (5th Cir. 1982). Another admiralty court encountered the same situation in *Compagnie Maritime Marfret v. United States, supra,* where the Government brought a Rule 12(b)(1) motion that invoked the discretionary function exception as grounds for abrogating subject matter jurisdiction over a SIAA claim in which the owners of a grounded vessel alleged "the grounding was due to the failure of the United States to: (1) properly position and maintain the aids to navigation that marked the entrance to the San Juan Harbor; (2) adequately warn mariners about inaccuracies in the position of these aids to navigation in the Bar Channel; and (3) properly notify mariners of the changes in the configuration of San Juan Harbor's Bar

Channel."  532 F.Supp.2d at 371-372. As that court explained when it applied the summary judgment standard to the motion before it:

> When a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) involves factual questions, the court must engage in a two-part inquiry. *Torres-Negron,* 504 F.3d at 162. First, the court must determine whether the relevant facts, which would determine the court's jurisdiction, also implicate elements of the plaintiff's cause of action. *Id.* at 163 (citing *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir.1997)). Where the court finds that 'the jurisdictional issue and substantive claims are so intertwined the resolution of the jurisdictional question is dependent on factual issues going to the merits, the district court should employ the standard applicable to a motion for summary judgment.' *Torres-Negron*, 504 F.3d at 162 (citing *Autery v. United States*, 424 F.3d 944, 956 (9th Cir.2005)). In this situation, the trial court should grant the motion to dismiss only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law. *Torres-Negron*, 504 F.3d at 162 (internal citations omitted). Therefore, 'if the plaintiff presents sufficient evidence to create a genuine dispute of material (jurisdictional) facts, then the case proceeds to trial, so that the factfinder can determine the facts, and the jurisdictional dispute will be reevaluated at that point.' *Id.*

*Id.* at 373; see also *Capt. Chance,* 506 F.Supp.2d at 1200, n. 3 ("In addressing a challenge to subject matter jurisdiction, a court may rely on Rule 12(b)(1) only 'if the facts necessary to sustain jurisdiction do not implicate the merits of plaintiff's cause of action.'") (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003).  As the *Compagnie Maritime Marfret* court summed up:

1   [T]his case involves the determination of whether the relevant statutes,

2   regulations, and internal guidelines provide the United States with

3   discretion to act or not to act, rendering it, thus, immune from suit in

4   accordance with the tenets of the discretionary function exception.

5   Persuaded by the analysis employed by other courts, we hold that the

6   United States' request for dismissal shall be reviewed under the

7   summary judgment standard.

8   532 F.Supp.2d at 374.[12]

9       Here, the Government's motion also calls for a determination of whether the

10  relevant statutes, regulations, and internal guidelines leave the United States with

11  discretion to act or not to act under the tenets of the discretionary function exception.

12  The Court should therefore review the Motion at bar under the summary judgment

13  standard. Indeed, this Court ordered Government "to file a motion for summary

14  judgment." (ECF 70.)  Because the Government did not file a motion for summary

15  judgment and instead seeks dismissal under Rule 12(b)(1), the motion is procedurally

16  and substantively flawed.

17  ### IV.    THE DISPUTED MATERIAL FACTS

18      During the pre-dawn hours of September 2, 2019, a fast-moving fire broke out

19  on the vessel *Conception* while she was anchored off the northern coast of Santa Cruz

20  Island.  (Material Fact Statement No. ("MSF") 1.)[13] She had 33 passengers and 6 crew

21  members on board.  (MSF 2.) That fire swept through the vessel and burned her to the

22  waterline, killing all 33 passengers and 1 crew member and seriously injuring a second

23  crew member. (MSF 3.)

---

[12]    Although the court in *Compagnie Maritime Marfret* ultimately granted the
motion to dismiss, it did so because decisions as to where to place buoys in a harbor,
on which plaintiff based its claim, were grounded in the exercise of discretionary
decisions and did not invoke any mandatory act required by a regulation, as is true
in the present case.

[13]    References to the Material Fact Statement are to the separate Statement of
Material Facts in Dispute that Plaintiffs' have filed concurrently.

*Conception* (O.V. 638133) was built of wood and fiberglass and was launched in 1981. (MSF 70.) She was 75 feet long, *id.*, measured 97 gross tons, *id.*, and was licensed by the United States Coast Guard, under 46 CFR, Chapter I, Subchapter T (the so-called "T Regs"), to carry up to 99 passengers on coastwise voyages. (*Id.*) *Conception* was based in Santa Barbara. (*Id.*) Her owner, Truth Aquatics, Inc., operated *Conception* and her two sisterships, *M/V Vision* and *M/Truth,* as "small passenger vessels" within the meaning of 46 C.F.R. § 175.110(a) and 46 U.S.C. § 2101(47). (MSF 2 and 17.) Like her two sisters, *Conception* had three decks: a sun deck atop the house (where the bridge and crew sleeping accommodations where situated); a main deck (where the salon and galley where housed); and a below-deck, bunk room deep in the hull (where all the passengers were berthed). (MSF 4.)

When the Department of Justice prosecuted *Conception's* captain, Jerry Boylan, under 18 U.S.C. § 1118, witnesses from the Bureau of Alcohol, Tobacco, and Firearms ("ATF") testified at the trial that the fire had started in a "Rubbermaid plastic trash can" that was customarily stowed on *Conception's* main deck, just aft of the salon, beneath a wooden ladder leading up to the sun deck. (MSF 6 and 11.) According to 45 C.F.R. § 177.405(f), "waste receptacles" aboard small passenger vessels like *Conception* "must be constructed of noncombustible materials with no openings in the sides or bottom." The Government admits that the plastic trash can identified by Boylan's prosecutors was combustible. (MSF 16.) *Conception's* after deck, salon, and galley were outfitted with several combustible trash cans. (MSF 18.) The trash can Boylan's prosecutors targeted as the source of the *Conception* fire had likely been on board the vessel since 2016. (MSF 12.) *Conception's* salon and galley were also outfitted with between 15 and 25 plastic garden chairs manufactured by the Grosfillex Company. (MSF 20.) Those chairs were also obvious fire hazards and had been sitting in *Conception's* salon and galley since 2008. (*Id.*)

It is hard to understand how MSD Santa Barbara could repeatedly certify that vessel as fit for service in the face of those obvious hazards. (MSF 18 and 21.) It is

harder still to grasp how the Government hopes to sweep all those careless certifications under the discretionary function rug.

A small passenger vessel like *Conception "*may not be operated without having on board a valid U.S. Coast Guard Certificate of Inspection." 46 C.F.R. 176.100(a). The Certificate of Inspection ("COI") *Conception* carried on September 2, 2019, had been in place since November 19, 2014, and was due to expire on November 19, 2019. (MSF 70); see also *Defense Exhibit F.* (ECF 88.8).) To keep that COI valid, the Coast Guard had to conduct "an annual inspection" of *Conception* and all her furnishings "within the 3 months before or after each anniversary date" of her original certification, 46 C.F.R. § 176.500(b), and "a drydock and internal structural examination" every five years. 46 C.F.R. § 176.600(c). If an OCMI detected a problem during such an inspection, he or she had to fill out a "CG-835 Deficiency Form" for the Coast Guard's "Marine Information for Safety and Law Enforcement" ("MISLE") database, 46 C.F.R. § 176.500(b)(1)(iii), direct the owner to correct the problem, *id.*, and perform a follow-up "inspection more detailed in scope to ensure that the vessel [was] in satisfactory condition and fit for the service" before she could sail again.    46 C.F.R. § 176.500(b)(1)(ii).  (See also MSF 44, 45, and 46.) The OCMIs must also document the discovery and correction of such deficiencies in a "MISLE Activity Summary Report." (See e.g. MSF 22, 42-47.)

Between the issuance of the *Conception's* last COI on November 19, 2014, and the tragic fire on September 2, 2019, OCMIs from MSD Santa Barbara inspected *Conception* no fewer than 7 times.  (MSF 21 and 22.) Those OCMIs could not have visited, much less inspected the vessel's sun deck, main deck, salon, galley, or bunkroom, without spotting the various Rubbermaid trash cans and multiple Grosfillex garden chairs. (MSF 18-20, 24-26*.*) Those combustible furnishings sat in their assigned places aboard *Conception* throughout her final five years, *id.*, and as evidenced by the digital images attached as Hillsman Decl., Exhibits 22 and 23*,* they were impossible to miss. Plaintiffs are therefore entitled to the inference that the hazards posed by those

combustible furnishings were obvious to any OCMI who boarded the vessel. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The undisputed evidence nonetheless shows that no one from the Coast Guard ever submitted a CG-835 or a MISLE Report calling for the removal of those hazards. (MSF 22, 25, and 26.) That is why the plastic trash can which the Government contends sparked this blaze was still aboard *Conception* on the night of the fire, and that is why the plastic garden chairs which helped spread the blaze so lethally still filled her salon.

*Conception* was also freighted with electrical problems. According to 46 C.F.R. § 176.806(a), at "each initial and subsequent inspection for certification of a vessel," OCMI's must examine "all cable as far as practicable without undue disturbance of the cable or electrical apparatus." 46 C.F.R. 176.806(a). According to 46 C.F.R. § 183.340(b)(1): "All cable and wire must [h]ave stranded copper conductors with sufficient current carrying capacity for the circuit in which they are used." According to 46 C.F.R. § 183.340(d)(2), all "[c]able and wire for power and lighting circuits" must be "listed by Underwriters Laboratories (UL), as UL Boat or UL Marine cable."

As Cmdr. Hodgson affirmed, "one of the obligations of a marine inspector is that he or she must review the MISLE database and review previous inspections to get a sense of the vessel's operational history." (Hillsman Decl., Exhibit 6 [Hodgson Trans.] at 217:25-218:5; MSF 14.) That obligation enables OCMIs "to get a sense of [the vessel's] history and operations, but [also] to get a sense of what kinds of deficiencies have shown up in the past." (*Id.* at 218: 6-10; MSF 14.) To repeat the key point, the catchall mandate in § 176.830(a) dictates that if an OCMI observes a deficiency that poses a "hazardous situation," that hazard "must be corrected" for the vessel's COI to remain valid and for the vessel to be permitted to sail.

Anyone who reviewed *Conception's* MISLE database would have discovered a long and alarming history of electrical deficiencies. An OCMI from MSD Santa Barbara sounded an early alarm on August 25, 2000, when he filed a Deficiency Form

warning that *Conception's* builder had equipped her with non-stranded wiring in violation of 46 C.F.R. § 183.340(b)(1). (MSF 27, 28, and 29.) Truth Aquatics promptly requested a waiver of § 183.340(b)(1), but the Coast Guard refused to grant it. (MSF 30.) It is not clear whether MDS Santa Barbara ever conducted a "more detailed inspection" to ensure that the vessel was "in satisfactory condition" before clearing that deficiency in March of 2002. (MSF 31.) What *is* clear is that when Plaintiffs' experts inspected *Conception's* burned-out hulk in the yard at Port Hueneme, they discovered shoddy wiring and non-marine cable of the very type described in that August 25, 2000, Deficiency Form. (Id.)

The Coast Guard plainly failed to root out *Conception's* built-in wiring deficiencies. When OCMIs from MSD Santa Barbara took an urgent look at *Conception's* sistership, *M/V Vision*, immediately after the fire, they discovered no less than 19 such deficiencies. (MSF 33.) By then, of course, it was too late for the people who died aboard *Conception*. MISLE Activity Summary Reports reveal that MSD Santa Barabara failed to conduct *any* examination of *Conception's* wiring during the annual inspections they conducted on March 19, 2004, January 26, 2011, September 24, 2013, February 4, 2015, and most importantly February 13, 2019 -- when the Coast Guard last certified that doomed vessel as safe to sail. (MSF 35.) Those omissions were blackletter violations of the mandatory duties spelled out in 46 C.F.R. § 176.806(a). (MSF 36, 38, and 39.)

The last OCMI to inspect *Conception* was Chief Warrant Officer Daniel Hagar. (MSF 26.) Hagar not only failed to inspect *Conception's* wiring on his last visit to the vessel, (MSF 39), he also failed to clear an "outstanding deficiency" that Chief Warrant Officer William DeCamp had written up on July 20, 2011. (MSF 48-52.) Chief DeCamp had discovered deficient "welding cable" in *Conception's* 24-volt system and had instructed *Conception's* owner, Glen Fritzler, to replace it with the "UL marine cable" required by 46 C.F.R. § 183.340(d)(2). But there is nothing in the MISLE database to suggest that DeCamp, Hagar, or anyone else ever cleared the July 20, 2011,

deficiency properly. DeCamp purported to clear it on January 24, 2013, when he reported *Conception's* electrical system "satisfactory." (MSF 49.) But following an administrative review on September 24, 2013, Hagar's report was corrected to "reflect that there had been ***no*** inspection of *Conception's* electrical system on January 24, 2013." (MSF 52.) Nor did Hagar inspect the electrical system on February 13, 2019, when he declared *Conception* "fit for service" for the very last time. (MSF 39.) Between her combustible furnishings and her shoddy electrical system, the *Conception* was a disaster waiting to happen.

## V.   ARGUMENT

### 1. THE GOVERNMENT'S MOTION MAY BE DENIED ON PROCEDURAL GROUNDS ALONE

#### A.   THE GOVERNMENT DID NOT COMPLY WITH LOCAL RULE 56.1

Although the Government has brought their threshold jurisdictional challenge as a motion under Rule 12(b)(1), this Court ordered them "to file a motion for summary judgment to determine whether the discretionary function exception to the Federal Tort Claims Act shields the United States from liability." (ECF 70.) According to L.R. 56-1:

> A party filing a notice of motion for summary judgment or partial summary judgment must file a separate "Statement of Uncontroverted Facts." This Statement must set forth the material facts as to which the moving party contends there is no genuine dispute. Each such fact must be numbered and must be supported by pinpoint citations (including page and line numbers, if available) to evidence in the record.

The Government failed to comply with that Rule. That failure constitutes sufficient grounds by itself for denying the Government's Motion.

> 'When a moving party fails to comply with Local Rule 56.1 the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own.

We may deny or dismiss a motion for summary judgment for failure to
comply with Local Rule 56.1.

*Vought v. Brighton,* 2024 U.S. Dist. LEXIS 59006, **2-3 (M.D. Penn. 2024)
(internal quotation marks and citation omitted).

**B.    THE COURT SHOULD ALSO DENY THE MOTION UNDER FED. R. CIV.
P. 56(d), BECAUSE PLAINTIFFS HAVE NOT BEEN AFFORDED FULL
ACCESS TO EVIDENCE AND THUS HAVE BEEN HAMPERED IN THEIR
ABILITY TO OFFER ALL EVIDENCE ESSENTIAL TO THEIR
OPPOSITION.**

"If a nonmovant shows by affidavit or declaration that, for specified reasons, it
cannot present facts essential to justify its opposition" to a motion for summary
judgment, "the court may defer considering the motion or deny it." Fed. R. Civ. P.
56(d)(1); see also *Program Engineering, Inc. v. Triangle Publications, Inc.*, 634 F.2d
1188, 1193 (9th Cir. 1980). The purpose of Rule 56(d) "is to prevent 'railroading' the
non-moving party through a premature motion for summary judgment before the non-
moving party has had the opportunity to make full discovery." *U.S. ex rel. Fisher v.
Network Software Associates*, 227 F.R.D. 4, 9 (D. D.C. 2005) (partial citation omitted)
(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).) The accompanying
affidavit of Plaintiffs' counsel shows that additional facts essential to justify opposition
to the Government's motion may exist but cannot currently be presented to the Court.
(Hillsman Decl., ¶¶ 2-3.)

For starters, the Government has not yet granted Plaintiffs access to all the
evidence the ATF relied on or any of the exhibits, reports and appendices it attached to
its Final Report ("underlying materials"). (Hillsman Decl., ¶¶ 2-3, 7.) The Department
of Justice refuses to release any of those materials until the Ninth Circuit has decided
the appeal Boylan is expected to take from his criminal conviction. (*Id.,* ¶¶ 7-8.)
Among other things, they include the results of the numerous intermediate- and full-
scale reproductions the ATF staged to test its "varying hypotheses regarding the area

of origin for the fire." (*Id.*, ¶ 6.) Since the jurisdictional issue raised by the Government's discretionary function arguments and the merits of the Plaintiffs' claims "are so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits," see *Rosales*, 824 F.2d at 803, and since Plaintiffs cannot prevail on the merits without establishing a causal link between the Government's alleged violation of a mandatory duty and the fire in which *Conception's* victims perished, see e.g. *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1031-1032 (9th Cir. 1989), Plaintiffs should not face summary dismissal until they have been given access to all the fire-origin information the ATF compiled. Indeed, since Plaintiffs maintain the fire was either precipitated or accelerated by the "thermal runaway" of lithium-ion batteries recharging in the after starboard quarter of the salon, (ECF 1 [Complaint] at 33:1-38), the Government may itself have an interest in deferring judgment on Plaintiffs' SIAA claims.

Plaintiffs and their attorneys have been diligently and persistently pursuing the information the Government has sequestered. They even asked this Court to compel the Government to produce that evidence under *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951). (MSF 71.) While in January and February of 2034, the Government provided Plaintiffs with an opportunity to inspect and photograph various electronic items recovered from the wreck, the Government still refuses to produce all the fire-origin information complied by the ATF. (Hillsman Decl., ¶ 10.) The Court should not decide this case on a summary motion until Your Honor and all parties have had a full and fair opportunity to weigh that evidence.

What is more, after the fire, FBI investigators discovered a hole in the piping of *Conception's* firefighting system. (MSF 60-62.) How and when did that hole develop? Should OCMI's have discovered and written it up? Since a firefighting system is clearly a "protective device" within the meaning of 46 C.F.R. § 176.830(a), the regulations required OCMIs from MSD Santa Barbara to ensure that the system's piping was "in satisfactory condition" at "each inspection for certification and at every

other vessel inspection." Plaintiffs have thus far been allowed only limited discovery, (ECF 70), and should not be required to oppose the instant Motion until the parties have the evidence necessary to resolve the issues posed by the hole the FBI discovered in that fire main.

The Court thus has ample grounds for denying this Motion under Rule 56(d).

## 2. THE GOVERNMENT'S MOTION SHOULD ALSO BE DENIED ON SUBSTANTIVE GROUNDS

### A. AS THE PARTY SEEKING SUMMARY DISMISSAL, THE GOVERNMENT MUST "SATISFY A DEMANDING STANDARD"

Summary judgment is "a drastic remedy and must be exercised with extreme care[.]" *Wabun-Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir. 1990). The dispositive question is always "whether the evidence presents a sufficient disagreement to require [a trial on the merits] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252. As the moving party, the Government has both "an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).

> Where, as here, a defendant seeks summary judgment 'on an affirmative defense on which it will bear the ultimate burden of proof at trial,' the defendant must satisfy a demanding standard. *Snyder v. Kohl's Dep't Stores, Inc.*, 580 F. App'x 458, 461 (6th Cir. 2014). Under these circumstances, summary judgment is proper 'only if the record shows that the defendant established the defense so clearly that no rational jury could have found to the contrary.' *Id.* (internal quotations omitted) (quoting *Beck-Wilson v. Principi*, 441 F.3d 353, 365 (6th Cir. 2006)); see *Speedeon Data, LLC v. Integrated Direct Mktg., LLC*, 718 F. App'x 333, 337 (6th Cir. 2017) (explaining that affirmative defenses

1    may be resolved at summary judgment, but that 'the defendant has the
2    burden to show that it is entitled to the defense').

3

4    *Cline v. Dart Transit Co.*, 2023 U.S. App. LEXIS 9521, **10-11 (6th Cir. 2023). If a
5    moving defendant carries its initial burden of production, nonmoving parties like the
6    instant Plaintiffs, must produce evidence from which a trier of fact could reasonably
7    infer that they have a *prima facie* claim. *Nissan Fire & Marine Ins. Co. v. Fritz Cos*.,
8    210 F.3d 1099, 1102 (9th Cir. 2000). When reviewing such evidence, "a district court
9    cannot resolve disputed questions of material fact; rather, that court must view all of
10   the facts in the record in the light most favorable to the non-moving party and rule, as
11   a matter of law, based on those facts." *Albino v. Baca*, 747 F.3d 1162, 1173 (9th Cir.
12   2014). And "if a moving party fails to carry its initial burden of production, the
13   nonmoving party has no obligation to produce anything," especially where, as in this
14   instance, the moving party would have had the ultimate burden of persuasion at trial.
15   *Nissan,* 210 F.3d at 1102.  That is the situation here.

16       **B.    THE GOVERNMENT DID NOT AND CANNOT SATISFY THAT DEMANDING**
17           **STANDARD**

18           **i.    TO OBTAIN SUMMARY JUDGMENT IN ITS FAVOR UNDER THE**
19               **DISCRETIONARY FUNCTION DEFENSE, THE GOVERNMENT MUST**
20               **ESTABLISH, AS A MATTER OF LAW, BOTH THAT THE OFFICIAL**
21               **CONDUCT IT IS TRYING TO SHIELD WAS DISCRETIONARY AND THAT IT**
22               **INVOLVED A SOCIAL, ECONOMIC, OR POLITICAL DECISION**

23       The discretionary function exception is "a qualification" to the waiver of
24   sovereign immunity.  *Earles v. United States*, 935 F.2d 1028, 1030 (9th Cir. 1991). It
25   exempts the Government from tort liability for "the exercise or performance or the
26   failure to exercise or perform a discretionary function or duty on the part of a federal
27   agency or an employee of the Government, whether or not the discretion involved be
28   abused." 28 U.S.C.S. § 2680(a). While that exception was codified as a "clarifying

amendment" to the FTCA, *Dalehite v. United States*, 346 U.S. 15, 26 (1953), the Ninth Circuit has held that it "applies to the SIAA as well[.]" *Earles*, 935 F.2d at 1031-1032.

The Supreme Court handed down a two-part test for determining the applicability of § 2680(a) in *United States v. Gaubert*, 499 U.S. 315, 322-325 (1991) and *Berkovitz v. United States*, 486 U.S. 531, 536-537 (1988):

> Courts are to ask first whether the challenged action was a discretionary one – i.e., whether it was governed by a mandatory statute, policy, or regulation. If the action is not discretionary, it cannot be shielded under the discretionary function exception.  Second, courts ask whether the challenged action is of the type Congress meant to protect – i.e., whether the action involves a decision susceptible to social, economic, or political policy analysis. *O'Toole v. United States*, 295 F.3d 1029, 1033-1034 (9th Cir. 2002) (summarizing *Gaubert/Berkovitz* test).

*Whisnant*, 400 F.3d at 1180-1181.

As noted above: "The burden of proving the applicability of the discretionary function exception" under that two-part test "is on the United States." *Bear Medicine*, 241 F.3d at 1213 (citing *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992)). To bear that burden, the Government must show that: 1) Its agent's action was not mandatory but "involve[d] an element of judgment" and; 2) the judgment was "of the kind that the discretionary function exception was designed to protect," to wit, a decision "based on considerations of public policy." *Gaubert*, 499 U.S. at 323. Congress adopted the discretionary function exception "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S. A. Empresa De Viacao Aerea Rio Grandense* (*Varig Airlines*), 467 U.S. 797, 814 (1984). It is thus "'the nature of the conduct, rather than the status of the actor' that governs whether the exception applies." *Gaubert*, 499 U.S. at 322 (quoting *Varig Airlines*, 467 U.S. at 813).

A review of the Ninth Circuit case law applying those principles reveals two important trends:

> First, a dominant theme in our case law is the need to distinguish between design and implementation: we have generally held that the design of a course of governmental action is shielded by the discretionary function exception, whereas the implementation of that course of action is not. Second, and relatedly, matters of scientific and professional judgment – particularly judgments concerning safety – are rarely considered to be susceptible to social, economic, or political policy.

*Whisnant*, 400 F.3d at 1181.  Both themes are inimical to the Government's Motion.

### ii. THE GOVERNMENT DID NOT AND CANNOT ESTABLISH AS A MATTER OF LAW THAT THE CONDUCT IT IS TRYING TO SHIELD WAS INDEED DISCRETIONARY

#### a. WHILE THE DESIGN OF A COURSE OF GOVERNMENTAL ACTION MAY BE A POLICY CHOICE SHIELDED BY THE DISCRETIONARY FUNCTION EXCEPTION, THE FAILURE TO FOLLOW POLICY CHOICES ALREADY MADE IS NOT

It is well settled that a remedial statute like the FTCA or SIAA "should be construed liberally, and its exceptions should be read narrowly." *O'Toole*, 295 F.3d at 1037 (citing *Kielwien v. United States*, 540 F.2d 676, 681 (4th Cir. 1976)). It follows "that not all types of judgment are protected by the discretionary function exception." *Ayala v. United States*, 980 F.2d 1342, 1348 (10th Cir. 1992). Most importantly for our case: "The decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not." *Bear Medicine*, 241 F.3d at 1215; see also *Soldano v. United States,* 453 F.3d 1140, 1148 (9th Cir. 2006) ("'We have generally held that the ***design*** of a course of governmental action is shielded by the discretionary function exception, whereas the implementation of that course of action

is not.'") (quoting *Whisnant*, 400 F.3d at 1181) (original emphasis).  It follows that "'a failure to effectuate policy choices already made' will not be protected under the discretionary function exception." *Bear Medicine*, 241 F.3d at 1215 (quoting *Camozzi v. Roland/Miller and Hope Consulting Group,* 866 F.2d 287, 290 (9th Cir. 1989).

> **b.    THE OCMIS FROM MSD SANTA BARBARA FAILED TO FOLLOW POLICY CHOICES ALREADY MADE WHEN THEY VIOLATED THE MANDATORY DUTIES SPELLED OUT IN THE T-REGS.**

In determining whether the discretionary function exception applies, courts "must 'consider whether the action is a matter of choice for the acting government employee.'" *Bear Medicine*, 241 F.3d at 1213 (quoting *Berkovitz*, 486 U.S. at 536) (brackets omitted). "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536). In other words: "An action specifically prescribed by a 'federal statute, regulation, or policy' is not within an agent's discretion and therefore not subject to the exception." *Bear Medicine*, 241 F.3d at 1213 (quoting *Gaubert*, 499 U.S. at 324-325); see also *Baker v. United States*, 817 F.2d 560, 566 (9th Cir. 1987) (discretionary function exception does not insulate the government from liability for "a negligent failure to obey a mandatory regulatory command"); *Collins v. United States*, 783 F.2d 1225, 1231 (5th Cir. 1986) ("To the extent than an employee refuses to carry out a mandatory statute or regulation, one which leaves him no discretion in the manner or extent to which it will be enforced, the employee is simply disobeying a flat command"); *Griffin v. United States*, 500 F.2d 1059, 1068 (3d Cir. 1974) ("no discretion was conferred to disregard [a] mandatory regulatory command"); *Markes v. United States*, 704 F. Supp. 337, 339 (N.D. N.Y. 1988) ("The discretionary function exception does not apply where mandatory agency guidelines or regulations are violated by federal employees"); *Barnson v. United States*,

630 F.Supp. 418, 422 (D. Utah 1985) ("The discretionary function exception does not
immunize failure to comply with a mandatory duty.").

According to the Government, Plaintiffs are challenging "the Coast Guard's
inspection and certification policies in their totality." (ECF No. 88-1 at 28:14-15.)
As we explain below, the Government fashioned that argument in hopes of bringing
this case under the rule handed down by *Varig Airlines.* But far from challenging a
federal agency's inspection and certification policies in their totality, we are
challenging only Chief Warrant Officer Hagar's and his fellow OCMIs' failure to
comply with mandates spelled out by regulations that reflect policy choices that were
already made.

As the individual designated by the Government to testify on its behalf as to
the "the day-to-day application of Subchapter T," Cmdr. Hodgson explained that 46
C.F.R. § 176.830(a) placed Hagar and his fellow OCMIs "under a mandatory duty
to identify, write up, and rectify all observed unsafe practices, fire hazards, and other
hazardous situations" aboard *Conception,* (MSF 14), "at each inspection for
certification and at every other vessel inspection." (Hillsman Decl., Exhibit 6
[Hodgson Trans.] at 29:20-30:23 and 230:7-24.) Cmdr. Hodgson admitted that the
Rubbermaid trash can and the Grosfillex garden chairs were obvious fire hazards.
(MSF 16 and 19.)  And when asked at his deposition about the garden chairs, OCMI
Hagar testified:

> Q. Are you aware that plastic chairs are potentially a fire hazard on
>    vessels?
> A. Yes.  I think there is a regulation that speaks to – I think we are
>    talking about furnishings.

(MSF 25; see also Hillsman Decl., Exhibit 11 [Hagar Trans.] at 93:25-94:4.) The
failure to identify, write up, and rectify those combustible trash cans and garden
chairs during inspection after inspection after inspection is indefensible; it was a
violation of the Government's mandatory duty to insure the fire safety of a vessel

that ultimately burned to the waterline – a fire that cause the deaths of 34 people. (MSF 11, 20, 21, 22, and 26.)

"At each initial and subsequent inspection for certification of a vessel," the directives in 46 CFR § 175.806(a) also placed Hagar and his fellow OCMIs under a mandatory duty to inspect "all [electrical] cable as far as practicable." (MSF 36.) Hagar affirmed that "inspecting the electrical system is required to be done by all vessel inspectors conducting and annual inspection on a T-vessel." (Hillsman Decl., Exhibit 11 [Hagar Trans.] at 114:23-115:2; see also MSF 36.) But the MISLE database shows, and Hagar admits, that he did not inspect *Conception's* electrical system on February 13, 2019, when he last certified that doomed vessel as fit for service. (MSF 38 and  39.) In fact, Hagar and his fellow OCMI's also failed to inspect *Conception's* electrical system on March 19, 2004, January 26, 2011, September 24, 2013, and February 4, 2015. (UMF 35.) That too was inexcusable.

"If deficiencies are found" during an annual inspection, 46 C.F.R. § 176.500(d)(ii) places the inspecting OCMI under a mandatory duty to "conduct an inspection more detailed in scope to ensure that the vessel is in satisfactory condition and fit for the service for which it is intended." (*Id.*) As Cmdr. Hodgdon admitted, "a marine inspector does not have discretion to ignore that obligation[.]" (UMF 53.) Chief Warrant Officer William De Camp violated that obligation on January 23, 2013, when he "cleared" the July 20, 2011, deficiency he had found in *Conception's* 24-volt system without re-inspecting her electrical system. (MSF 48-52.) The discretionary function exception does not shield such derelictions.

     **iii.**   **NOR CAN THE GOVERNMENT ESTABLISH, AS A MATTER OF LAW, THAT THE MISJUDGMENTS ITS OCMIS MADE WERE BASED ON SOCIAL, ECONOMIC, OR POLITICAL POLICY.**

Closing its eyes to the mandatory duties spelled out the C.F.R.s, §§ 176.500(d)(ii), 175.806(a), and 176.830(a), and still hoping to shoehorn our case into the *Varig Airline* rule, the Government argues that "the question here is whether

the statutes, regulations, and policies that establish the maritime safety program allowed Coast Guard inspectors to determine the scope of their inspections and whether to issue *Conception* a certificate of inspection." (ECF No. 88-1 at 30:15-19.) But to repeat the key point: "The decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not." *Bear Medicine*, 241 F.3d at 1215. It is well settled that the day-to-day judgments of those charged with implementing precautions which have already been adopted "– particularly judgments concerning safety – are rarely considered to be susceptible to social, economic, or political policy." *Whisnant,* 400 F.3d at 1181. "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536).  That is the situation here.

C.     **THE GOVERNMENT'S COUNTERARGUMENTS ARE UNAVAILING**

i.     **THE DISTINCTION THE GOVERNMENT HOPES TO DRAW BETWEEN THE "OLD T REGS" AND THE "NEW T REGS" DOES NOT PROVIDE IT ANY REFUGE**

The Government hopes to excuse MSD Santa Barbara's derelictions by noting that the Old-T Regs make "an allowance for 'existing vessels'" like *Conception,* "with only limited exceptions where grandfathering is not allowed." (ECF 88-1 at 19:25-28.) But this case falls squarely within those exceptions. As the Government tacitly concedes, the New-T Regs do not permit grandfathering "for electrical standards." (*Id.* (citing 46 C.F.R. §§ 175.112 and 183.115(b)). What is more, 46 C.F.R. § 177.115(b) dictates that "when outfit items such as furnishings and mattresses are renewed" aboard an older vessel like *Conception*, they "must comply with" the New-T regs.

It cannot be reasonably disputed that the combustible Rubbermaid trash cans and plastic Grosifillex garden chairs were "furnishings" within the meaning of §

177.115(b). (MSF 23.) If follows that Chief Hagar and his fellow OCMIs had a mandatory duty under 46 C.F.R. 176.830(a) to write those trash cans and garden chairs up as "obvious fire hazards" and order them off the vessel. (MSF 14, 16, and 19.) According to Boylan's prosecutors, the failure to do so was a precipitating cause of this catastrophe. (MSF 11.)

           **ii.    THE AUTHORITIES ON WHICH THE GOVERNMENT RELIES ARE INAPPOSITE**

Using the holding in *Varig Airlines* as its primary springboard, the Government leaps to the conclusion that the discretionary function exception "bars [the *Conception* families'] challenge to the Coast Guard's oversight role because Congress did not intend to impose liability on the United States for the type of regulatory enforcement activities at issue in this case." (ECF No. 88-1 at 14:11-14.) But the regulatory enforcement activities at issue in *Varig Airlines* and the other cases on which the Government relies[14] are very different from the ones at issue here.

The plaintiffs in *Varig Airlines* challenged the entire "compliance review process" that was spelled out "in handbooks and manuals developed by the [Civil Aeronautics Agency] and [Federal Aviation Administration]." 467 U.S. at 805-806. That process permitted those agencies to certify aircraft types based on a "spot check" of the manufacturer's work. *Id.* at 817. The Supreme Court barred that challenge under 28 U. S. C. § 2680(a) because the Federal Aviation Act, 49 U.S.C.

---

[14]    See *Cassens v. St. Louis River Cruise Lines, Inc.*, 44 F.3d 508, 513 (7th Cir. 1995) ("the checklists did not prescribe a specific mandatory course of action for the inspectors to follow"), *Foster Logging, Inc. v. United States,* 973 F.3d 1152, 1162 (11th Cir. 2020) ("There was no mandatory statute, regulation, or policy controlling the Park Service's process for inspecting and maintaining trees"), *Autery v. United States,* 992 F.2d 1523, 1528 (11th Cir. 1993) ("It is the governing administrative policy, not the Park Service's knowledge of danger . . . that determines whether certain conduct is mandatory"), and *Lam v. United States,* 979 F.2d 665, 670 (9th Cir. 2020) ("this case turns on the Corps' policies [which] are not mandatory and allow for discretion").

§ 1421(a)(1), gave the Secretary of Transportation discretion "to establish and implement a mechanism for enforcing compliance with minimum safety standards according to her 'judgment of the best course.'" *Varig Airlines,* 467 U.S. at 816 (quoting *Dalehite*, 346 U.S. at 34). The Secretary's adoption of the FAA's compliance review process thus involved "political, social, and economic judgments" of the very type the discretionary function exception was designed to protect. *Id.* at 820. Chief Hagar's and his fellow OCMIs' repeated failure to comply with the mandatory duties spelled out in 46 CFR §§ 176.500(d)(ii), 175.806(a), and 176.830(a) did not.

### iii. THE GOVERNMENT SHOULD NOT BE HEARD TO ARGUE THAT PLAINTIFFS' COMPLAINT DOES NOT SPECIFY ALL THEIR THEORIES OF RECOVERY

The issues on summary judgment are generally "framed by the complaint." *Rodriguez v. Countrywide Homes*, 668 F. Supp. 2d 1239, 1246 (E.D. Cal. 2009) (citing *Coleman v. Quaker Oats Co*., 232 F.3d 1271, 1292-1293 (9th Cir. 2000)). Under Fed. R. Civ. P. 8, however, the complaint "serve[s] the limited role of providing the opposing party with notice of the claim or defense to be litigated and 'mere technicalities' should not prevent cases from being decided on the merits." *Laface v. Eastern Suffolk BOCES*, 349 F. Supp. 3d 126, 163 (E.D. N.Y, 2018) (internal quotation marks, ellipses, and citations omitted). The Government may argue that Plaintiffs' complaint did not give the defense sufficient notice of Plaintiffs' theories. Not so. (See ECF No. 1 [Complaint] at 34:21-35:22.) But should the Court find otherwise, Plaintiffs respectfully request leave to amend under Fed. R. Civ. P. Rule 15(a)(2).

"[A]n action should not be dismissed for lack of jurisdiction without giving the plaintiff an opportunity to be heard unless it is clear the deficiency cannot be overcome by amendment." *Jones v. Community Redevelopment Agency,* 733 F.2d 646, 650 (9th Cir.1984).   As a consequence:

1 The Courts have shown a strong liberality . . . in allowing amendments under
2 Rule 15(a). Leave should be freely given to allow amendment for the purpose
3 of presenting the real issues of the case, where the moving party has not
4 exercised bad faith and is not acting to delay the disposition of the case, where
5 the opposing party would not be prejudiced, and when unnecessary delay will
6 not result if the motion to amend is granted. The clearest cases for leave to
7 amend are correction of an insufficient claim or defense and clarification of
8 previously alleged claims. Leave to amend should also be freely granted to
9 correct or clarify an insufficient statement of the jurisdictional basis of the
10 suit.

11 *Medoil Corp. v. Clark*, 753 F. Supp. 592, 596 (W.D. N.C. 1990) (internal quotation
12 marks and citations omitted). No one in this case has acted in bad faith, discovery has
13 barely begun, the Government has not been "blindsided," and most importantly,
14 Plaintiffs will be severely prejudiced if their case is not decided on the merits. We
15 should therefore "be guided by the underlying purpose of Rule 15 – to facilitate
16 decision on the merits rather than on the pleadings or technicalities." *United States v.*
17 *Webb,* 655 F.2d 977, 979 (9th Cir. 1981).

18 ## VI.  CONCLUSION

19 As the Fourth Circuit instructed in *Holloway v. Pagan River Dockside Seafood*,
20 669 F.3d 448 (4th Cir. 2012), where the defendant asked the court to dismiss a Jones
21 Act case under Rule 12(b)(1) on the "fact-intensive" ground that plaintiff was not a
22 "seaman":

23 [T]he Supreme Court has cautioned against 'drive-by jurisdictional
24 rulings,' *Steel Co.*, 523 U.S. at 91, that dismiss a claim '"for lack of
25 jurisdiction" when some threshold fact has not been established,
26 without explicitly considering whether the dismissal should be for lack
27 of subject matter jurisdiction or for failure to state a claim,' *Arbaugh v.*
28 *Y & H Corp.*, 546 U.S. 500, 511 (2006) (quoting *Da Silva v. Kinsho*

*Int'l Corp.*, 229 F.3d 358, 361 (2d Cir. 2000)).  Its admonition is grounded in the principle that the subject matter jurisdiction of a federal court is not generally resolved by concluding that the plaintiff has failed to allege an element of a federal cause of action or that the plaintiff might not be able to prove an element of a federal cause of action. Rather, a court must look more fundamentally at whether the plaintiff's claim is determined by application of a federal law over which Congress has given the federal courts jurisdiction. If it is, his complaint should not be dismissed for a lack of subject matter jurisdiction, as the federal courts have been given the power and the authority to hear and resolve such claims.

*Id.* at 452.

That is the situation here. The Government is asking this Court to abrogate subject matter jurisdiction by concluding that the *Conception* families' SIAA claims might be subject to the discretionary function exception. Since those claims will be determined by application of a federal law over which Congress has given this Court jurisdiction, this Court has the authority to hear and resolve them on the merits and should not dismiss them in a "drive-by jurisdictional ruling." Where, as here, Plaintiffs have presented sufficient evidence to create a genuine dispute of material fact concerning the applicability of the discretionary function exception, their claims should procced to trial whence the Court can decide that dispute and evaluate the jurisdictional question after a full and fair hearing on the merits. *Marfret,* 532 F.Supp.2d at 373.

For all of the reasons set forth above, and in Plaintiffs' supporting evidence set forth in the Statement of Material Facts in Dispute and the supporting declarations, deposition testimony and documentary evidence, Plaintiffs respectfully request that the Court deny the motion to dismiss in its entirety.

Dated:  July 8, 2024,                           Respectfully Submitted,
                                                NELSON & FRAENKEL  LLP
                                                MCGUINN, HILLSMAN & PALEFSKY
                                                SALTZ MONGELUZZI & BENDESKY, P.C.

                                                By ___//s// Gretchen M. Nelson_____
                                                       Gretchen M. Nelson
                                                Attorneys for Plaintiffs

                                                Additional Plaintiffs Counsel:

                                                WALKUP MELODIA KELLY
                                                      SCHOENBERGER
                                                PANISH SHEA BOYLE & RAVIPUDI LLP
                                                FIORE ACHERMAN, A Law Corp.
                                                SCHUERING ZIMMERMAN & DOYLE,
                                                      LLP
                                                KREINDLER & KREINDLER LLP
                                                LAW OFFICE OF W. RUSSELL FIELDS
                                                GALINE FRYE FITTING & FRANGOS
                                                ARNOLD & ITKIN LLP
                                                TODD M. ABBOTT, ESQ.

### Certification Pursuant to Local Rule 5-4.3.4(a)(2)(i)

Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filer attests that all other signatories listed and on whose behalf the filing is submitted, concur in the content of the filing and have authorized the filing.

Dated:  July 8, 2024

                                                By ___/s/ Gretchen M. Nelson_____
                                                       Gretchen M. Nelson